**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Kevin James FOLEY, Appellant.**

Superior Court of Pennsylvania.

Argued March 29, 2011.

Filed Feb. 15, 2012.

---

7. Section 1106(c)(3) states:

Bruce A. Antkowiak, Latrobe, for appellant.

William R. Stoycos, Assistant District Attorney, Harrisburg, for Commonwealth, appellee.

BEFORE: PANELLA, SHOGAN, and COLVILLE*, JJ.

OPINION BY PANELLA, J.

Appellant, Kevin James Foley, appeals from the judgment of sentence entered on June 1, 2009, by the Honorable William J. Martin, President Judge of the Court of Common Pleas of Indiana County, Criminal Division. After careful review, we affirm.

In the early morning hours of April 13, 2006, Dr. John Yelenic, a dentist living alone in Blairsville, Pennsylvania, was brutally assaulted and murdered in his home. After an eight-day jury trial, Foley, a Pennsylvania State Police Trooper who was living with Dr. Yelenic's estranged wife,[1] was found guilty of first-degree murder and sentenced to life imprisonment. This timely appeal followed.

Appellant presents the following issues for our review:

I. WHETHER THE TRIAL COURT ERRED IN PRECLUDING THE TESTIMONY OF BETTY MORRIS AT TRIAL, WHERE THE EVIDENCE WAS RELEVANT AND ADMISSIBLE TO DEMONSTRATE THE MOTIVE OF ANOTHER PERSON TO COMMIT THE CRIME?

II. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE TESTIMONY OF DR. MARK PERLIN, IN VIOLATION OF THE *FRYE* TEST FOR THE ADMISSIBILITY OF NOVEL SCIENTIFIC TESTIMONY?

III. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE?

IV. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING THE

* Retired Senior Judge specially assigned to the Superior Court.

1. The Commonwealth refers to Dr. Yelenic's wife as his "soon-to-be ex-wife." Appellee's Brief, at 37. However, Dr. Yelenic and his wife were married at the time of the murder, and representatives of Dr. Yelenic's estate were unable to obtain a posthumous divorce. *See Yelenic v. Clark,* 922 A.2d 935, 936 (Pa.Super.2007).

SHOE PRINT EVIDENCE AT TRIAL?

V. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE PERMISSIVE INFERENCE OF MALICE FROM THE USE OF A DEADLY WEAPON?

Appellant's Brief, at 4. We proceed to the merits.

■ Foley's first claim is that the trial court erred in excluding the testimony of Bette Morris.[2] The trial court may exercise its discretion in deciding whether to admit evidence, and our review of the trial court's evidentiary decisions is limited to determining whether the trial court abused its discretion. *See Commonwealth v. Moser*, 999 A.2d 602, 605 (Pa.Super.2010). The trial court abused its discretion only if its ruling "reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." *Id.*

During the criminal investigation of this case, Bette Morris said to a law enforcement officer that on two occasions she had observed Dr. Yelenic engaged in intimate acts with his next door neighbor, Melissa Uss. According to Foley's counsel, if placed on the stand, Bette Morris would deny that she had ever made such observations, and then counsel would treat her as a hostile witness and impeach her with the statement she gave police. *See* N.T., March 17, 2009, at 135. When the Commonwealth objected that this evidence was irrelevant, Foley's counsel explained that it

was intended to show that Melissa Uss's husband had a motive to kill Dr. Yelenic: "[A] jury could infer that somebody who was having a romantic affair with Dr. Yelenic, the husband might be inclined to do something and that is a fair inference from that." *Id.*, at 137. However, when the trial court asked whether the defense had any evidence that Melissa Uss's husband knew of the supposed intimate acts, defense counsel conceded that he had no such evidence. *See id.* According to the defense, Bette Morris's observations were made when Mr. Uss was in the military and not at home.[3] *See id.*, at 135.

■ The trial court excluded the testimony of Bette Morris on the grounds that it was "a mere suggestion of motive and therefore irrelevant and inadmissible." Opinion and Order of Court, November 4, 2009, at 10. Generally, "proof of facts showing the commission of the crime by someone else is admissible." *Commonwealth v. Boyle*, 470 Pa. 343, 368 A.2d 661, 669 (1977). However, the Pennsylvania Supreme Court has held that facts suggesting that someone had a motive should not be considered by the jury if the person had no knowledge of the suggestive facts. *See Commonwealth v. Giovanetti*, 341 Pa. 345, 19 A.2d 119, 125 (1941).

In *Giovanetti*, the murder victim had an employer-provided life insurance policy with his wife, the defendant, listed as the beneficiary. *See id.* The trial court refused the defendant's request to instruct the jury that it could consider the insurance policy as evidence of her motive only if it found that she knew about the policy

---

**2.** In his brief, Appellant refers to this witness variously as "Betty Morris," "Bette Morris," and "Bette Davis." Appellant's Brief, at 4, 23. This opinion will refer to her as Bette Morris, which is consistent with the notes of testimony and Appellee's brief. *See* N.T., March 17, 2009, at 134, 141.

**3.** Although Foley called Melissa Uss as a witness, he did not ask her any questions regarding the alleged romantic relationship with Dr. Yelenic. *See* N.T., March 16, 2009, at 106–15. Foley did not call her husband as a witness.

before the murder. *See id.* The Supreme Court reversed, holding that the wife's knowledge of the policy was necessary for it to be considered as evidence of her motive to kill. *See id.*

■ The trial court's decision to preclude the testimony of Bette Morris had a sufficient basis in the governing law and was not an abuse of discretion. Although intimate contact between the victim and Melissa Uss may *suggest* that her husband had a motive, "merely suggesting that someone else may have had a motive is not evidence." *Commonwealth v. Rivers,* 537 Pa. 394, 644 A.2d 710, 715 (1994). The trial court acted within its discretion in rejecting the testimony as irrelevant because the husband had no knowledge of the intimate contact. *See Giovanetti,* 19 A.2d at 125. Because there was no other evidence corroborating the suggestion that Mr. Uss was a killer motivated by jealousy, the trial court's decision to preclude the testimony of Bette Morris was a permissible exercise of discretion.

Foley's reliance on *Commonwealth v. Ward,* 529 Pa. 506, 605 A.2d 796 (1992), is misguided. In that case, the defendant was a police informant who was convicted of arson. The trial court precluded evidence that the people whom he had informed against had threatened him and had committed the arson in retaliation against him. *See id.,* at 797. In addition, the trial court precluded testimony from "an American Red Cross worker as to appellant's request for assistance following the fire, the organization's investigation, and its subsequent provision of emergency fund vouchers for clothing," which the defendant sought to introduce in order to "undermine the Commonwealth's evidence of motive by arguing the unlikelihood that appellant would destroy all of his own worldly possessions merely because of a disagreement with his brother." *Id.*

*Ward* is distinguishable from the instant case. In *Ward,* the defendant's offer of proof indicated that the other potential perpetrators knew that the defendant had given information about them to the police. *See id.* Further, the precluded evidence from the Red Cross worker concerned the defendant's own motive to commit the crime rather than someone else's motive. Unlike the testimony at issue in the instant case, the evidence at issue in *Ward* was relevant, and its exclusion violated the defendant's fundamental right to introduce relevant, admissible evidence. *See id.* (citing *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

■ Foley's next claim is that the trial court erred in admitting the DNA-related testimony of Dr. Mark Perlin. A sample containing DNA from the victim and another person was found underneath the fingernail of the victim. This mixed sample was tested in a laboratory at the FBI, and three experts—Dr. Perlin, Dr. Robin Cotton, and Jerrilyn Conway, an FBI forensic scientist—used the FBI's data in developing their testimony. Each of the experts determined that Foley's DNA profile was consistent with DNA found in the sample. The experts differed in their estimates of the probability that someone other than Foley would possess DNA matching the DNA found in the sample— Conway testified that the probability that another Caucasian could be the contributor was 1 in 13,000; Dr. Cotton testified that the probability was 1 in 23 million; and Dr. Perlin testified that it was 1 in 189 billion.

As with other evidentiary decisions, the trial court may exercise its discretion in deciding whether to admit expert testimony. *See Commonwealth v. Ventura,* 975 A.2d 1128, 1140 (Pa.Super.2009). The trial court's decision will be reversed only if the

appellate court finds an abuse of discretion or an error of law. *See id.*

■ Foley claims that Dr. Perlin's testimony is inadmissible because it fails the *Frye*[4] test for the admissibility of scientific evidence. *See* Appellant's Brief, at 31. Pennsylvania continues to adhere to the *Frye* test, which provides that "novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Betz v. Pneumo Abex LLC*, 998 A.2d 962, 972 (Pa.Super.2010) (en banc) (citing *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038 (2003)). The *Frye* test is a two-step process. *See id.* First, the party opposing the evidence must show that the scientific evidence is "novel" by demonstrating "that there is a legitimate dispute regarding the reliability of the expert's conclusions." *Id.* If the moving party has identified novel scientific evidence, then the proponent of the scientific evidence must show that "the expert's methodology has general acceptance in the relevant scientific community" despite the legitimate dispute. *Id.* (internal quotation marks omitted).

The trial court did not expressly determine whether Dr. Perlin's testimony was "novel scientific evidence." Opinion and Order of Court, March 3, 2009, at 2–3. Instead, the court found that Dr. Perlin's methodology was a refined application of the "product rule," a method for calculating probabilities that is used in forensic DNA analysis. *See id.*, at 2. The Pennsylvania Supreme Court has held that scientific evidence based on the product rule is admissible in the Commonwealth. *See Commonwealth v. Blasioli*, 552 Pa. 149, 713 A.2d 1117, 1118 (1998). Because Dr. Perlin's calculations were made using newer technology, the trial court rhetorically asked "at what point does the use of the product rule become novel science." Opinion and Order of Court, March 3, 2009, at 2. The trial court went on to find that Dr. Perlin's methodology was generally accepted. *See id.*, at 3, 5.

■■ We find that Dr. Perlin's testimony was not "novel" as that term is defined in the governing law, and thus the trial court did not abuse its discretion in admitting the testimony. The "novelty" of scientific testimony turns on whether "there is a legitimate dispute regarding the reliability of the expert's conclusions," which is not necessarily related to the newness of the technology used in developing the conclusions. *Betz*, 998 A.2d at 972. In *Betz*, the court noted that novelty "is not restricted to new science," and "even 'bedrock' scientific principles may be subject to a *Frye* analysis" if those principles become disputed. *Id.*, at 973–74. Conversely, where there is no dispute, *Frye* should be "construed narrowly so as not to impede admissibility of evidence that will aid the trier of fact in the search for truth." *Id.*, at 972.

Here, we find no legitimate dispute regarding the reliability of Dr. Perlin's testimony. Dr. Perlin used proprietary software called TrueAllele to interpret the data he received from the FBI. *See* N.T., March 12, 2009, at 130. Foley claims that Dr. Perlin's testimony should have been excluded for three reasons: (1) "as of the date of the pre-trial hearing, no forensic laboratory in the United States used Perlin's TrueAllel [sic] method in analyzing a mixed sample of DNA for forensic purposes"; (2) "the TrueAllel [sic] system had never been used in a court of law in any jurisdiction in the United States on a mixed DNA sample to give a likelihood ratio"; and (3) no outside scientist can

---

4. *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

replicate or validate Dr. Perlin's methodology because his computer software is proprietary. Appellant's Brief, at 35.

Foley's first claim does not amount to a showing of "novelty" because it does not show a "legitimate dispute regarding the reliability of the expert's conclusions." *Betz*, 998 A.2d at 972. Regardless, Foley understates the extent of usage of Dr. Perlin's system. As Dr. Perlin testified:

> The TrueAllele technology is used by New York State for all of their data banking and bringing their casework system on board. The Allegheny County Crime Lab has been using our system as a service and recently purchased the system for looking at mixtures in complex cases and DNA evidence. The World Trade Center engaged us to reanalyze all of the data and rematch it using our methods from the eighteen thousand (18,000) or so victim remains and the three thousand (3000) missing people and so on and there are other groups that we work with.

N.T., Mar. 12, 2009, at 132.

In addition, the United Kingdom's Forensic Science Service uses TrueAllele technology to analyze crime scene evidence and build the UK National DNA Database, which is the largest of its kind in the world. *See* Forensic Science Service Expands License for Cybergenetics Automated DNA Data Review Technology; Pioneering TrueAllele Software Helps Builds [sic] World's Largest DNA Database, Business Wire, July 26, 2004, available at http://tinyurl.com/8yxh8hd (last visited Nov. 21, 2011); *see also* Opinion and Order of Court, March 3, 2009, at 5.

■ Foley's second reason for excluding the testimony is not persuasive because "novelty" of a scientific methodology does not turn on its previous use in court. During cross-examination, Dr. Perlin testified that he did not know whether any users of TrueAllele had used it in a case that went to trial. *See* N.T., March 12, 2009, at 133–34. Even if Foley is correct that TrueAllele has never been used in court, this would not prove novelty. The Commonwealth's "continued adherence to the *Frye* test is based upon its interest in having judges be guided by scientists when assessing the reliability of a scientific method, and not the other way around." *Betz*, 998 A.2d at 979 (internal quotation marks omitted). If this court assessed "novelty" of scientific evidence based on its previous use in court, we would be failing to defer to scientists in assessing the reliability of scientific methods. Rather than looking to previous uses in court, we find "novelty" only if there is a dispute among scientists. *See Betz*, 998 A.2d at 972.

■ Foley's third reason for exclusion is misleading because scientists can validate the reliability of a computerized process even if the "source code" underlying that process is not available to the public. TrueAllele is proprietary software; it would not be possible to market TrueAllele if it were available for free. *See* N.T., Hearing, February 18, 2009, at 54. Nevertheless, TrueAllele has been tested and validated in peer-reviewed studies. One study used laboratory-generated DNA samples and found that quantitative analysis performed by TrueAllele was much more sensitive than qualitative analysis such as that performed by the FBI. *See* Perlin & Sinelnikov, An Information Gap in DNA Evidence Interpretation, 4 PLoS ONE e8327, at 10 (2009), available at http://dx.doi.org/10.1371/journal.pone.0008327. A recent paper entitled "Validating TrueAllele® DNA Mixture Interpretation" used DNA samples from actual cases and reached similar results. *See* Perlin et al., Validating TrueAllele® DNA Mixture Interpretation, 56 Journal of Forensic Sciences 1430 (2011). The study "validated

the TrueAllele genetic calculator for DNA mixture interpretation" and found that "[w]hen a victim reference was available, the computer was four and a half orders of magnitude more efficacious than human review."[5] *Id.*, at 1444. Both of these papers were published in peer-reviewed journals; thus, their contents were reviewed by other scholars in the field.

Because Foley has failed to establish the existence of a legitimate dispute over Dr. Perlin's methodology, he has failed to show that Dr. Perlin's testimony constituted "novel" scientific evidence. *See Betz*, 998 A.2d at 972. Therefore, we find that the trial court's decision to admit the testimony was not an abuse of discretion. Absent a legitimate dispute, there is no reason to "impede admissibility of evidence that will aid the trier of fact in the search for truth." *Id.*

■ Foley's next claim is that the trial court abused its discretion when it admitted evidence related to bloody shoeprints found at the murder scene. Foley claims that a new trial should be awarded because this evidence was irrelevant and highly prejudicial. *See* Pa. R. Evid. 402, 403. As noted above, this court will find an abuse of discretion only if the trial court's ruling "reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." *Commonwealth v. Moser*, 999 A.2d 602, 605 (Pa.Super.2010).

Foley claims the shoeprint evidence was irrelevant because "[t]he shoe prints found at the scene could not be authoritatively determined to be any particular brand, style, or size of shoe." Appellant's Brief, at 61. At trial, the Commonwealth introduced expert testimony from an FBI forensic examiner that the shoeprints at the crime scene apparently were left by an Asics brand running shoe with the model name "Gel Creed" or "Gel Creed Plus." N.T., March 13, 2009, at 45. The FBI forensic examiner noted that he could not state his opinion with one hundred percent certainty because the FBI database does not contain reference information for every shoe manufactured in the world. *See id.*, at 47

The Commonwealth also introduced testimony from Terry Schalow, a product manager for Asics America Corporation. He testified that the shoeprint was left by an Asics Gel Creed, Gel Creed Plus, or a knockoff of this type of shoe. *See id.*, at 18–19. The size was between ten and twelve and a half. *See id.*, at 18. Only about 25,000 Gel Creed shoes were sold in the United States. *See id.*, at 20. Importantly, Foley ordered a size ten Gel Creed from Asics in August 2003. *See id.*, at 25, 27.

■ Contrary to Foley's position, the uncertainty in this testimony goes to its weight rather than its admissibility. Foley emphasizes that neither expert could state with absolute certainty that the shoeprints were left by size 10 shoes manufactured by Asics and purchased by Foley. However, to be relevant and admissible, "evidence need not be conclusive." *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395, 402 (1994). Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. *See id.* Here, the shoeprint evidence supported a reasonable inference that Foley was at the scene of the crime. This relevant, though inconclusive, evidence was admissible, and "its weight and persuasiveness were prop-

---

5. In this case, a victim reference was available because the evidence was taken from the victim's fingernail. *See* N.T., March 12, 2009, at 89.

erly matters for the jury to determine." *Id.*, at 403.

■■■ Foley's charge that the shoeprint evidence was "highly prejudicial" is also not persuasive. *See* Appellant's Brief, at 64. The Pennsylvania Rules of Evidence provide that "[a]lthough relevant, evidence may be excluded if its probative value is outweighed by the danger of **unfair** prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa. R. Evid. 403 (emphasis added). Evidence is not unfairly prejudicial simply because it is harmful to the defendant's case. *See Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa.Super.2009). Rather, exclusion of evidence on this ground "is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Id.* While the shoeprint evidence tended to support an inference that Foley committed the crime, there is no reason to believe that it improperly inflamed the jury. Thus, the trial court did not abuse its discretion by admitting the shoeprint evidence.

■■■ Next, we turn to Foley's claim that the jury's verdict was against the weight of the evidence. Foley preserved this claim for appellate review by raising it with the trial judge in a post-sentence motion. *See* Pa. R.Crim. P. 607; *see also* Opinion and Order of Court, November 4, 2009, at 1. Our standard of review is well-settled:

> The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses.
>
> As an appellate court, we cannot substitute our judgment for that of the finder of fact. Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock one's sense of justice. A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience."
>
> Furthermore,
>
> where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Cruz*, 919 A.2d 279, 281–82 (Pa.Super.2007) (citations omitted).

We find that the trial court did not abuse its discretion in finding that the verdict was not against the weight of the evidence. Over the course of the eight-day trial, copious evidence linking Foley to the crime was presented to the jury. This evidence was comprehensive and credible enough to support the verdict.

At the time of the murder, Foley was living with Dr. Yelenic's estranged wife. Foley had expressed his hatred of Dr. Yelenic to numerous individuals—Foley had said that he wished Dr. Yelenic would die, and on one occasion Foley asked a fellow police officer to help him kill Dr. Yelenic. On three occasions, Foley attempted to have Dr. Yelenic investigated and arrested for child abuse, and Foley was frustrated by his lack of success.

Foley had an opportunity to commit the crime. At the approximate time of the murder, he was driving from a hockey game in Delmont to his home in Indiana, which took him past Blairsville, where Dr. Yelenic resided.

Foley's DNA profile was consistent with DNA found under Dr. Yelenic's fingernail, and the most conservative estimate of the likelihood that someone else would possess a consistent profile was one in 13,000.[6] On the night before the murder, Foley had no abrasion on his forehead, but on the morning following the murder he had an injury on his forehead described by three eyewitnesses as "a fingernail scratch" and by others as a cut that appeared to be "fresh."

The shoeprint evidence, discussed above, supported a reasonable inference that Foley was present at the scene. Foley said that he did not remember what happened to the size 10 pair of Gel Creed shoes he ordered in 2003.

Dr. Yelenic was slashed by a sharp instrument, and Foley was known by his colleague to be a "knife guy" who habitually flicked open and shut a knife that he carried with him. In fact, Foley once accidentally sliced open a supervisor's pair of pants in the groin area when he was walking past him. When informed of Dr. Yelenic's death shortly after the discovery of the murder, Foley was unemotional, expressed no curiosity about the nature or cause of death, and only asked which law enforcement agency was in charge of the investigation. After the murder, Foley stopped playing with his knife and started wearing Nike brand shoes instead of Asics.

Given this evidence, the verdict is hardly shocking to the judicial conscience. The court below acted within the bounds of its discretion as the finder of fact. Thus, we reject Foley's claim that the verdict was against the weight of the evidence.

■ Finally, we turn to Foley's argument that the trial court erred in instructing the jury on the permissive inference of malice from the use of a deadly weapon. The trial court instructed the jury that "[i]f you believe that the defendant intentionally used a deadly weapon on a vital part of John J. Yelenic's body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant acted with malice." N.T., March 18, 2009, at 229.

■ Foley concedes that the Supreme Court of Pennsylvania has approved this charge in a homicide case. *See Commonwealth v. Jones*, 590 Pa. 202, 912 A.2d 268, 279–80 (2006). Nevertheless, Foley argues that "this is an unconstitutional charge that deprived him of due process and should now be overruled." Appellant's Brief, at 65. However, this court has a "duty and obligation to follow the decisional law of [the Supreme Court of Pennsylvania]." *Commonwealth v. Shaffer*, 557 Pa. 453, 734 A.2d 840, 844 n. 6 (1999). "The primary role of the Superior Court is to apply existing law to the cases that come before us. It is not our function to attempt reversing viable Supreme Court rulings...." *L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard Inc.*, 777 A.2d 1090, 1096 (Pa.Super.2001).

Because the challenged jury instruction has been approved by the Supreme Court, we find that the trial court accurately instructed the jury on the law of the Commonwealth. *See Jones*, 912 A.2d at 279–

---

**6.** Foley does not challenge the reliability of the scientific methodology underlying this es-   timate.

80. Accordingly, we reject Foley's claim and affirm the judgment of sentence.

Judgment of sentence affirmed. Jurisdiction relinquished.