J-A21007-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MALIK ANTWIAN JACKSON | : | |
| | : | |
| Appellant | : | No. 1788 MDA 2024 |

Appeal from the Judgment of Sentence Entered October 2, 2024
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0000043-2022

BEFORE: PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.: **FILED: SEPTEMBER 12, 2025**

Malik Antwian Jackson appeals from the judgment of sentence imposed on October 2, 2024 for his convictions of possession of small amount of marijuana, driving under influence of alcohol or controlled substance ("DUI"), and unlawful activities.[1] Jackson argues the trial court erred in allowing the forensic toxicologist, Stephanie Marco, to testify to her review of another analyst's work product and provide her opinion that Jackson had marijuana in his blood in violation of ***Smith v. Arizona***, 602 U.S. 779 (2024). After our careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(31), 75 Pa.C.S.A. §§ 3802(d)(1)(i), and 4107(b)(2), respectively.

Jackson was charged with the above offenses by criminal complaint filed on October 18, 2021. Jackson proceeded to a bench trial on October 2, 2024. The trial court set forth the relevant factual history:

During the October 2, 2024 bench trial, Joshua Reager testified that on October 16, 2021, he was an officer for the Highspire Borough Police Department. On that day at around 1:00 p.m. he observed a small Toyota sedan travelling eastbound on Route 230 in the borough. The Toyota was traveling towards Officer Reager, so he was able to see that the windshield was tinted. Officer Reager made a U turn with the intent to stop the vehicle for inspection and possible Title 75 violation. Officer Reager followed the Toyota into an apartment complex where he observed the vehicle backing into a parking spot. He parked his vehicle and activated his emergency lights to notify the driver he was approaching him. Officer Reager identified [Jackson] as the driver of the vehicle.

Officer Reager approached [Jackson] and asked for his driver's license, registration and insurance card. Officer Reager described [Jackson] as defiant as he refused to provide the information he requested. When Officer Reager approached the driver's side of the vehicle, [h]e detected a strong odor of marijuana; he was unable to identify whether it was coming out of the car, or off of [Jackson]. Officer Reager observed that [Jackson] had glossy, blood shot eyes. [Jackson] moved towards the back of the vehicle and when Officer Reager told him not to enter the trunk, [Jackson] responded that the officer was ["]going to need back up.["] At that point, Officer Reager detained [Jackson] and placed him in the back of his police car. Officer Reager secured the vehicle and waited for back up to arrive. Officer Reager made the decision to impound the car and request a search warrant.

Once the car was being towed, Officer Reager took [Jackson] to the Dauphin County booking center to request a blood draw. [Jackson] consented to the blood draw. Officer Reager observed the blood being drawn and took custody of the sealed kit once it was completed. He placed the kit into the evidence refrigerator at the police department and another officer transferred the kit to FedEx and it was sent to NMS Labs. A search warrant was ultimately issued, and the vehicle was searched during which a small amount of marijuana and rolling papers were found.

Melissa Sheely testified that on October 16, 2021, she was working as a medical assistant at PrimeCare, which is a company that provides services for the Dauphin County prison system. She recalled drawing blood for [Jackson] on that date. Ms. Sheely identified the process by which the blood was drawn and stored and the paperwork she ultimately signed at the completion of the draw.

Stephanie Marco testified that she is employed at NMS Labs as a toxicologist. She offers testimony as an expert in forensic toxicology. She explained that when offering expert testimony, she bases her opinion on reviewing the raw data, she does not physically handle the sample being tested. Ms. Marco noted that in this particular case, she was aware that the sample arrived through FedEx. Ms. Marco explained the process by which a sample is received, identified and tracked once it reaches the laboratory. She explained that all samples receive a unique bar code that enables the sample to be tracked throughout the process of analysis as it moves through the laboratory. Ultimately, based on the samples provided and tested, [Jackson's blood sample] tested positive for THC.

Trial Court Opinion, 2/3/25, at 2-4 (record citations omitted).

The trial court found Jackson guilty and sentenced Jackson to 6 months of restrictive probation, with the first 4 days in Dauphin County Prison, followed by the remainder of the six months on standard probation. Jackson filed a timely appeal and complied with the court's order to file a Rule 1925(b) statement. **See** Pa.R.A.P. 1925(b).

Jackson raises one issue for our review:

Whether, pursuant to the United States Supreme Court's holding in **Smith v. Arizona**, 602 U.S. 779 (2024), the lower court erred in allowing a non-testing scientist to testify about tests and reports from other scientists as the basis of their ultimate conclusion that [] Jackson had a controlled substance in his blood[?]

Appellant's Brief, at 4.

Jackson argues his right to confront his accusers was violated when Marco testified to her report, which was premised upon the work of others. *See* Appellant's Brief, at 10. Jackson argues the United States Supreme Court's decision in *Smith* overrules, or at least abrogates, our Pennsylvania Supreme Court's decision in *Commonwealth v. Yohe*, 79 A.3d 520 (Pa. 2013). *See id.* at 29.

"[T]he issue of whether a defendant was denied his right to confront a witness under the confrontation clause of the Sixth Amendment is a question of law for which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Bloom*, --- A.3d ---, 866 WDA 2024, at *5 (Pa. Super. filed July 10, 2025) (citation omitted).

> The Confrontation Clause of the Sixth Amendment, made applicable to the States via the Fourteenth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. In *Crawford* [*v. Washington*], 541 U.S. 36, 51 (2004)], the [U.S. Supreme] Court held that the Sixth Amendment guarantees a defendant's right to confront those who bear testimony against him, and defined testimony as a solemn declaration or affirmation made for the purpose of establishing or proving same fact. The Confrontation Clause, the High Court explained, prohibits out-of-court testimonial statements by a witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.

*Yohe*, 79 A.3d at 530-31 (italics, citations, footnotes, quotation marks, ellipses, and brackets omitted).

> The Clause's prohibition applies only to testimonial hearsay—and in that two-word phrase are two limits. First, in speaking about witnesses—or those who bear testimony—the Clause confines itself to testimonial statements, a category whose contours we

have variously described. Second and more relevant here, the Clause bars only the introduction of hearsay—meaning, out-of-court statements offered to prove the truth of the matter asserted. When a statement is admitted for a reason unrelated to its truth, we have held, the Clause's role in protecting the right of cross-examination is not implicated.

*Smith*, 602 U.S. at 784-85 (citations and quotation marks omitted).

[W]hether a statement is testimonial depends on its primary purpose:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Yohe*, 79 A.3d at 531 (citation and quotation marks omitted).

"[The Confrontation Clause's] prohibition applies in full to forensic evidence. So a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." *Smith*, 602 U.S. at 783 (citation omitted). In *Yohe*, our Supreme Court agreed that toxicology reports obtained by police in determining whether a suspect was DUI is testimonial and subject to the Confrontation Clause. *See Yohe*, 79 A.3d at 537. This is because "the report was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial and was plainly

created for an evidentiary purpose." *Id.* (citations and internal quotation marks omitted).

However, at the time our Supreme Court decided *Yohe*, the U.S. Supreme Court had "left unresolved precisely who the analyst is or, in circumstances involving multiple analysts, which analyst or analysts must testify." *Id.* at 538. The *Yohe* Court sought to answer that question.

In *Yohe*, after police stopped Yohe for inoperable license plate and brake lights, the officer observed signs of intoxication. *See id.* at 523. The officer requested and obtained a blood sample and sent that sample to NMS Labs for analysis. *See id.* At NMS Labs, an employee confirmed the seal was not broken, labeled the sample, and placed it in a secured bin. *See id.* Another employee then retrieved the sample, removed a portion of blood (called an aliquot), returned the sample to storage, and tested the aliquot for alcohol content. *See id.* This first test was completed using enzymatic assay. *See id.* A third employee conducted two more tests with the sample by removing two new aliquots from the sample and testing those aliquots using gas chromatography. *See id.* Finally, a fourth employee, Dr. Lee Blum, received all data from the three prior employees, examined the results of the three tests, confirmed the chain of custody, and authored a report indicating what Yohe's BAC was at the time the blood sample was drawn. *See id.* at 523-24. Despite Yohe's objections, Dr. Blum's report was the report utilized at trial to convict Yohe. *See id.* at 524.25.

After reviewing in detail the U.S. Supreme Court decisions in ***Melendez-Diaz v. Massachusetts***, 557 U.S. 305 (2009), ***Bullcoming v. New Mexico***, 564 U.S. 647 (2011), and ***Williams v. Illinois***, 567 U.S. 50 (2012), our Supreme Court parsed out who of the four employees were required to testify to satisfy the Confrontation Clause. The ***Yohe*** Court found that Dr. Blum was the analyst that must testify to satisfy the Confrontation Clause:

> According to Dr. Blum's trial testimony, he reviewed the case folder, verified the chain of custody information and examined the personal identification information. Additionally, he checked the testing that was performed and the data that resulted, evaluated the analytical data from the duplicate gas chromatography and the enzymatic assay, compared the results of the two gas chromatography tests, compared the result of the enzymatic assay test to the two gas chromatography tests, ensured that these numbers supported each other, and reported the lowest of the two gas chromatography test results as Appellant's BAC.
>
> \*\*\*
>
> Based on these facts, we hold that Dr. Blum is the analyst who determined Appellant's BAC. Although he relied on the raw data produced by the lab technicians and utilized this raw data in reaching an expert opinion premised on his evaluation of the case file, he is the only individual who engaged in the critical comparative analysis of the results of the gas chromatography tests and the enzymatic assay and determined Appellant's BAC. Dr. Blum was at the top of the inferential chain, and utilized the data that preceded his analysis in reaching his conclusion. He reached the conclusion in the Toxicology Report based on his analysis of the raw data, certified the results, and signed his name to them. As lab supervisor, moreover, Dr. Blum was generally familiar with standard procedures and able to identify any deviations from this procedure or any problems with the particular lab technician. Accordingly, Dr. Blum supervised [the two employees who conducted the tests], evaluated and validated the entire record, decided which number to report as Appellant's blood alcohol content, and signed his name to the report. He was,

therefore the certifying analyst who authored the Toxicology Report, and the analyst whom Appellant had a right to confront.

*Id.* at 539-40.

As noted above, Jackson argues **Smith** abrogated or overruled **Yohe**. The **Smith** Court recognized that its prior decisions, especially **Williams**, has "sown confusion in courts across the country about the Confrontation Clause's application to expert opinion testimony." **Smith**, 602 U.S. at 789 (internal quotation marks and citation omitted).

In **Smith**, police executed a search warrant on a property and found Smith at the property along with a large quantity of what appeared to be different types of drugs and drug-related items. **See id.** Smith was arrested and charged with possessing methamphetamine, marijuana, and cannabis for sale and possessing drug paraphernalia. **See id.** In preparation for trial, Arizona sent the items off to be tested and analyst Elizabeth Rast tested the items, found them to contain drugs, created notes and a final report. **See id.** at 789-90. Rast's notes documented the types of tests run and the results, including the weight of each type of drug. **See id.** at 790. Arizona intended to call Rast as an expert witness at trial to testify to her testing procedures and findings. **See id.**

However, three weeks prior to trial, Arizona decided to call another analyst because Rast had left her employment with the lab. **See id.** Instead, Arizona called Greggory Longoni, who reviewed Rast's notes and report and came to his own "independent opinion" that the items contained drugs. *Id.* at

790-91. Smith objected to the testimony of Longoni arguing a violation of his Confrontation Clause rights and then appealed after he was convicted. **See id.** at 791. All Arizona courts affirmed, finding that an expert is permitted to rely on the substance of a non-testifying witness's analysis because the underlying facts are not admitted for their truth, but "only to show the basis of the in-court witness's opinion[.]" **Id.** at 791-92 (internal quotation marks, brackets, and citation omitted). The U.S. Supreme Court accepted certiorari to address "the application of [the Confrontation Clause] to a case in which an expert witness restates an absent lab analyst's factual assertions to support his own opinion testimony." **Id.** at 783.

The U.S. Supreme Court rejected the notion that the underlying facts were not admitted for their truth:

> [T]ruth is everything when it comes to the kind of basis testimony presented here. If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts. How could it be otherwise? The whole point of the prosecutor's eliciting such a statement is to establish—because of the statement's truth—a basis for the jury to credit the testifying expert's opinion. Or said a bit differently, the truth of the basis testimony is what makes it useful to the prosecutor; that is what supplies the predicate for—and thus gives value to—the state expert's opinion. So there is no meaningful distinction between disclosing an out-of-court statement to explain the basis of an expert's opinion and disclosing that statement for its truth. A State may use only the former label, but in all respects the two purposes merge.
>
> ***
>
> Rast's statements thus came in for their truth, and no less because they were admitted to show the basis of Longoni's expert opinions.

All those opinions were predicated on the truth of Rast's factual statements. Longoni could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what Rast had reported about her work in the lab—that she had performed certain tests according to certain protocols and gotten certain results. And likewise, the jury could credit Longoni's opinions identifying the substances only because it too accepted the truth of what Rast reported about her lab work (as conveyed by Longoni). If Rast lied about all those matters, Longoni's expert opinion would have counted for nothing, and the jury would have been in no position to convict. So the State's basis evidence—more precisely, the truth of the statements on which its expert relied—propped up its whole case. But the maker of those statements was not in the courtroom, and Smith could not ask her any questions.

\*\*\*

… Here, the State used Longoni to relay what Rast wrote down about how she identified the seized substances. Longoni thus effectively became Rast's mouthpiece. He testified to the precautions (she said) she took, the standards (she said) she followed, the tests (she said) she performed, and the results (she said) she obtained. The State offered up that evidence so the jury would believe it — in other words, for its truth. So if the out-of-court statements were also testimonial, their admission violated the Confrontation Clause. Smith would then have had a right to confront the person who actually did the lab work, not a surrogate merely reading from her records.

*Id.* at 795-800 (quotation marks, emphasis, brackets, and citations omitted).

Based upon ***Smith***'s finding that the analyst who testified was relying on the truth of the testing analyst's notes, Jackson argues his conviction for DUI must be reversed and a new trial ordered. ***See*** Appellant's Brief, at 32-34. As Jackson points out, Marco testified that she "reviewed the raw data and did not handle the sample[,]" conduct the tests, or calibrate the machines. ***Id.*** at 32. Because Marco did not conduct the tests herself, she only assumed

the analysts did their job correctly and Jackson was left without his constitutional right to confront the actual witness against him: the analysts who performed the tests. *See id.* at 33.

The Commonwealth responds that *Smith* did not explicitly overturn or abrogate *Yohe*. *See* Appellee's Brief (unpaginated). Further, the Commonwealth asserts Marco is not the type of surrogate witness *Smith* disapproved of in their decision. *See id.* The Commonwealth asserts *Yohe* is controlling, and under *Yohe*, the appropriate analyst testified. *See id.* We agree with the Commonwealth's position.

Marco testified she is employed as a toxicologist at NMS Labs. *See* N.T. Trial, 10/2/24, at 41. In this case, another analyst tested Jackson's blood using liquid chromatography. *See id.* at 44. Marco testified to the process NMS staff took to test Jackson's blood. *See id.* at 46-47. First, "there's a screening process." *Id.* at 46. A small portion of the blood is removed to do the screening process which looks for classes of drugs. *See id.* at 46-47. If a class of drug is present during the screening process, the second step is to remove another portion of blood from the sample and test it with liquid chromatography. *See id.* at 47. Marco did not conduct either of those tests and merely reviewed the raw data, she "physically do[esn't] handle the sample." *Id.*

Specifically, Marco's "role [at NMS Labs] as a toxicologist is to perform independent reviews on any of the samples that are run in our laboratory to

ensure that [] any standard operating procedures as well as the test results are accurately represented on the toxicology report." *Id.* at 47-48. This includes a review of all documentation associated with Jackson's sample. *See id.* at 49, 50-51. She is able to review all the documentation associated with a given sample because each sample is given a unique bar code and identification number when it arrives at NMS Labs. *See id.* at 51-52. That bar code is scanned every time an employee touches, moves, or tests the sample. *See id.*

Marco never touched Jackson's blood sample, the portions that were removed, nor did any testing. *See id.* at 55-56. Marco did not calibrate the machines for accuracy. *See id.* at 55. Further, she admits that she "work[s] on the assumption that [the other employees] did their job[s] correctly[.]" *Id.* at 56. Jackson was not able to confront those other employees.

Based upon our review of the record, Jackson's argument regarding *Smith* may have merit. This case mirrors *Smith* in that "[Marco] effectively became [the other employees'] mouthpiece. [She] testified to the precautions ([others] said) [they] took, the standards ([others] said) [they] followed, the tests ([others] said) [they] performed, and the results ([they] said) [they] obtained." *Smith*, 602 U.S. at 800.

However, our Supreme Court has not yet addressed *Smith*. As such, *Yohe* has not been overturned or abrogated. "[T]his [C]ourt has a duty and obligation to follow the decisional law of the Supreme Court of Pennsylvania."

*Commonwealth v. Foley*, 38 A.3d 882, 892 (Pa. Super. 2012) (citation, brackets, and internal quotation marks omitted). This is because "[t]he primary role of the Superior Court is to apply existing law to the cases that come before us. It is not our function to attempt reversing viable [Pennsylvania] Supreme Court rulings[.]" *Id.* (citation and internal quotation marks omitted). "It is elementary that unless the United States Supreme Court reverses a decision of [the Pennsylvania Supreme] Court, or [the Pennsylvania Supreme] Court overrules its own prior decision, the law emanating from the decision remains law." *Commonwealth v. Reid*, 235 A.3d 1124, 1159 (Pa. 2020) (citation and internal quotation marks omitted).

Based upon *Yohe*, which addressed an NMS Labs analyst's testimony based upon the same review conducted here, there is no error in the trial court's decision. *See Yohe*, 79 A.3d at 539-40.

> [Marco] was at the top of the inferential chain, and utilized the data that preceded [her] analysis in reaching [her] conclusion. [She] reached the conclusion in the Toxicology Report based on [her] analysis of the raw data, certified the results, and signed [her] name to them. … [She] was, therefore the certifying analyst who authored the Toxicology Report, and the analyst whom Appellant had a right to confront.

*Id.* at 540.

Accordingly, because the Pennsylvania Supreme Court has not yet addressed **Smith**, and **Yohe** remains binding precedent, the trial court did not err when it allowed the introduction of Marco's testimony. As such, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/12/2025