J-A20028-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF ASHLEY NICHOLE BOUHER, JENNIFER S. BOUHER AND RICHARD A. BOUHER, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| GIFTWARES CO., INC., CONSOLIDATED RAIL CORPORATION PENNSYLVANIA LINES, LLC., BARRY DICKMAN, GREGG DICKMAN, MITCHELL DICKMAN, GIFTWARES ASSOC., NORFOLK SOUTHERN RAILWAY COMPANY, ROYERSFORD BOROUGH AND PATRICK J. SULLIVAN, | |
| Appellees | No. 2999 EDA 2014 |

Appeal from the Order Entered October 9, 2014
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2009-37236

BEFORE:  DONOHUE, SHOGAN, and WECHT, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED OCTOBER 23, 2015**

The Estate of Ashley Nichole Bouher, Jennifer S. Bouher, and Richard A. Bouher (collectively, the "Estate") appeals from the order dated October 9, 2014, in the Court of Common Pleas of Montgomery County, granting summary judgment in favor of Consolidated Rail Corporation Pennsylvania Lines, LLC and Norfolk Southern Railway Co. (the "Railroads"), and Giftwares Co., Inc., Barry Dickman, Gregg Dickman, and Mitchell Dickman, ("Giftwares").  After careful review, we affirm in part and reverse in part.

The trial court detailed the factual and procedural background, as follows:

    I.     <u>FACTS AND PROCEDURAL HISTORY</u>:

        The present appeal arises out of a fatal motor vehicle accident which occurred on March 10, 2008, at approximately 7:55 pm in Royersford, Montgomery County, Pennsylvania. Patrick Sullivan, Defendant herein, was the driver of the vehicle (then 19 years old); Leonard Luciano (then 19 years old), Kyle Warfel (then 17 years old) and Ashley Bouher (then 16 years old) were all passengers. Passenger Ashley Bouher died as a result of the accident.

    A. <u>Factual Background</u>

        For background purposes, the record shows that Defendant/Sullivan had just purchased the 2003 Ford Crown Victoria [on the] morning of March 10, 2008, at the Mannheim Auto Auction. Later that afternoon, Mr. Sullivan picked up the passenger/friends listed above, as well as Lauren Perry who purchased a case of beer for the underage occupants. Sullivan dropped off Perry, post-purchase, and then drove the remaining passengers to a drinking area known as the "firepit" in a clearing on First Ave/River Road in Royersford. The friends spent an hour or two at the firepit where they drank beer and/or allegedly used drugs. Driver Sullivan consumed either one or two beers.

        Thereafter, Sullivan and his passengers returned to the vehicle and travelled through Royersford. By this time, it was after sunset. According to the crash investigation performed by Montgomery County Detectives, Sullivan's vehicle travelled north on First Avenue at approximately 62 mph, in a posted speed limit of 25 mph, when his vehicle crossed over railroad tracks which were located at a slight curve in the roadway, and lost lateral stability. The vehicle then left the paved road surface and entered a stone parking area on Defendant Giftware's private property. The vehicle travelled across a portion of this area, and then the driver side rear door of Sullivan's vehicle, where Ms. Bouher sat, struck the right corner of Giftware's parked trailer, impacting Ms. Bouher at head level. This trailer was parked 17 feet off the roadway. Due to the impact, the driver's side door sustained damage, and opened. The car then spun counter-

clockwise and ejected Ms. Bouher from the vehicle. The vehicle crossed back over First Avenue, struck a utility pole, and came to rest on Giftware's private property on the eastern side of First Avenue. Ms. Bouher was pronounced dead at the scene.

Subsequent police inspection of Sullivan's vehicle showed no mechanical problems. In addition, Montgomery County Detective Turner re-enacted the accident, and indicated that the markings in the street were all consistent with the application of hard acceleration and forceful steering, and that, there was no indication that Sullivan ever applied the brakes. Finally, a witness indicated that, earlier that afternoon, he saw Sullivan's vehicle pass him very quickly, drive down River Road, enter Defendant Giftware's parking lot, and proceed to do a donut or donuts with the car.

As a result of the above accident, the Commonwealth of Pennsylvania filed criminal charges against the driver, Patrick Sullivan. On January 23, 2009, the Defendant/driver Sullivan pled guilty to one count of Involuntary Manslaughter and two counts of Recklessly Endangering Another Person, here, Ashley Bouher. In the plea transcript, Defendant Sullivan admitted to travelling at an excessive rate of speed which caused him to lose control of his vehicle on the night in question. *(See Notes of Testimony from Guilty Plea, 1/23/09, Pgs. 9-10)*[.] During the guilty plea, Sullivan also admitted that he was familiar with the terrain and layout of First Avenue where the accident occurred, and likewise admitted that he was aware of the condition of the road. *Id.* These sworn statements, on the record, provided the factual basis for Sullivan's guilty plea. *Id.*

Thereafter, the Estate of Ashley Nichole Bouher, by and through her parents Richard A. Bouher and Jennifer S. Bouher, as Administrators of her Estate; Richard A. Bouher, individually; and, Jennifer S. Bouher, individually, filed the present civil suit against several Defendants. The Defendants include (1) Giftwares Company, Inc., d/b/a Giftwares Company, Giftwares Associates, and its principles, Barry Dickman, Mitchell Dickman and Gregg Dickman (collectively, "Giftwares"); (2) Consolidated Rail Corporation and Norfolk Southern Railway Co. (collectively, "the Railroad Defendants"); and (3) Patrick J. Sullivan, the driver. The Borough of Royersford was an additional Defendant in the above captioned matter, however the Plaintiffs settled with the Borough. Notably in 2014, the Plaintiffs settled their civil suit against Defendant driver, Patrick Sullivan. *(See*

*Montgomery County Docket Entry 387, Amended Order-Approval of Settlement dated 1/15/14)*[.] Consequently, with the present posture, the Giftwares and Railway Defendants are the only Defendants remaining in the action.

With reference to these remaining Defendants, Plaintiffs allege, *inter alia,* **that the Giftwares Defendants and the Railroad Defendants each** failed to maintain their property, and that such lack of maintenance contributed to the accident in question. Plaintiffs likewise allege that **Defendant Giftwares** created a dangerous condition in the way that it parked [its] trailers on [its] property, thereby contributing to the accident in question.

The Giftwares Defendants argue, *inter alia,* that no cause of action exists against them for the following reasons: (1) the occupants of the vehicle were trespassers and there is no evidence of willful or wanton conduct by Giftwares; (2) Giftwares had no duty to ensure that their private property was suitable for out-of-control vehicles that enter upon its' land; (3) Giftwares owed no duty to institute measures that would attempt to prevent the vehicle from entering its' private property; and (4) no proximate cause exists as none of the alleged actions by Giftwares caused Sullivan's vehicle to deflect from the highway.

The Railway Defendants argue that in the 1980s, they formally abandoned any ownership interest in the industrial track running along the river side of River Road, and have had no dealings with the property since that time. In addition, the Railway Defendants assert that they did not negligently maintain the railway tracks crossing over River Road.

B. Procedural Background

The Honorable Emanuel A. Bertin, since retired, was assigned this civil action, pre-trial. On April 10, 2013, Judge Bertin issued a protective order in favor of Defendant, Patrick Sullivan.

\* \* \*

This action was subsequently rotated to the undersigned. On August 26, 2014, the matter was given an assigned trial date of October 14, 2014 through October 28, 2014. The parties filed several pre-trial motions including, Plaintiffs' Motion to Lift Protective Order and Defendants' Motions in Limine pursuant to

Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). The court held argument on September 15, 2014 and October 1, 2014, respectively. The opinion *subjudice* addresses these pre-trial rulings, which ultimately form the basis for the presently appealed, October 9, 2014, summary judgment rulings in favor of the Defendants.

That is, on October 9, 2014, the trial court granted Defendant, Giftwares Company, Inc.'s oral Motion for Summary Judgment and entered judgment in favor of Defendant Giftwares Company Inc. and against Plaintiffs. *(See October 9, 2014, Order)*[.] On that same date, the trial court also granted the Railway Defendants' oral Motion for Summary Judgment and entered judgment on behalf of Defendants, Norfolk Southern Railway Company, Pennsylvania Lines LLC and Consolidated Rail Corporation and against Plaintiffs. *(See October 9, 2014, Order)*[.]

Trial Court Opinion, 2/23/15, at 1–7 (emphases in original).

The trial court had also earlier authored Findings of Fact and Conclusions of Law relative to the Railroads' and Giftwares' motions *in limine* to preclude the Estate's experts, Dr. Steven Batterman ("Batterman") and Russell J. Kolmus ("Kolmus"), from testifying. The trial court granted the motions in part as to Batterman and in full as to Kolmus. Order, 10/8/14, at 23–25. The day after the trial court issued its order on the allowable scope of the experts' testimonies, the Railroads and Giftwares orally motioned for summary judgment, arguing that the Estate could not prove causation. The Estate conceded that without Batterman and Kolmus, it had no evidence of causation. Telephone Conference, 10/9/14, at 10–11. The concession reasoned the trial court's summary judgment award in favor of the Railroads and Giftwares. *Id*. at 12. This appeal followed.

The Estate raises six issues for review:

Did the Trial Court err in failing to compel the deposition of Defendant Patrick Sullivan and granting a Protective Order regarding the same?

Did the Trial Court err[] in failing to review the Protective Order and not allowing Plaintiffs to properly review the Protective Order?

Did the Trial Court err in precluding the testimony of Plaintiffs' expert witnesses?

Did the Trial Court [err in] applying the **Frye** standard and [in failing] to conduct a procedurally correct **Frye** hearing?

Did the Court err in failing to correct the record upon showing of demonstrable error?

Did the Honorable Carolyn Carluccio err in failing to recuse herself upon a clear showing of the bias and failing to properly consider Plaintiffs' motion regarding the same?

Estate's Brief at 4. We condense these issues into three—the protective order, the **Frye** issue, and the motion for recusal.

## Protective Order

On July 27, 2012, Patrick Sullivan ("Sullivan") filed a motion for a protective order to preclude his deposition and testimony at trial because engaging in such activities would result in a serious risk of harm to his mental health. Giftwares filed a motion to compel Sullivan's deposition and testimony, and the Estate joined Giftwares' motion.

On January 18, 2013, the presiding judge, Honorable Emanuel A. Bertin, conducted an evidentiary hearing on both motions. Sullivan did not appear. Sullivan's mother, Teresa Sullivan, testified that her son had been treated for bipolar disorder prior to the accident that killed Ashley Bouher.

- 6 -

N.T. (Protective Order Hearing), 1/18/13, at 39. She also recounted that Sullivan twice attempted suicide following the accident. *Id*. at 16. In conjunction with one of the suicide attempts, Sullivan typed on his computer "Ashley take me home." *Id*. at 18. Mrs. Sullivan described her son at the time of the hearing as being "in a really dark place" who has "lost his will to live." *Id*. at 14.

Sullivan also submitted four letters from his treating psychiatrist, Dr. Samir Farag. Motion for Protective Order, 7/27/12, Exhibits A–D.[1] Dr. Farag stated that Sullivan had been under his care for monthly medication management for a mood disorder and psychotherapy since August 2007. After the car accident in 2008, Dr. Farag explained that Sullivan experienced symptoms of "severe Post Traumatic Stress Disorder (PTSD)." *Id*. at Exhibit A.

In his first letter dated May 26, 2011, Dr. Farag wrote that Sullivan was "emotionally unstable," "fragile," and has "suicidal thoughts." Motion for Protective Order, 7/27/12, Exhibit A. Dr. Farag also confirmed the suicide attempts and four hospitalizations for psychiatric reasons. *Id*. He opined that Sullivan would not be able to participate in a deposition

---

[1] Dr. Farag's letters dated May 26, 2011, June 15, 2011, and July 5, 2012, were attached as Exhibits A through C to the motion for the protective order. The motion was supplemented with Exhibit D, Dr. Farag's letter dated January 17, 2013, at the January 18, 2013 hearing on the motion. N.T. (Protective Order Hearing), 1/18/13, at 100–101.

concerning the auto accident due to an "increase[d] risk of suicide and exacerbation of his unstable symptoms." *Id*. One month later, Dr. Farag penned a second letter representing that Sullivan continued to experience severe depression symptoms, and offered that Sullivan would need "at least three more months of treatment with medication and psychotherapy in order to be able to participate in the deposition." *Id*. at Exhibit B. Dr. Farag wrote a third letter one year later, describing Sullivan as "depressed and withdrawn," and suffering from "suicidal ideations." *Id*. at Exhibit C. He further clarified that he was unaware of what a deposition would entail when he had previously represented that Sullivan might be able to be deposed after more therapy and now believed that Sullivan may "never be able to safely, without serious risk to his mental status or physical well-being, to participate in a deposition or testify in a trial regarding his car accident." *Id*. In his final letter, dated January 17, 2013, Dr. Farag stated that Sullivan "remains depressed, emotionally labile, fragile and withdrawn, having flashbacks and suicidal ideations off and on." Sullivan's Second Supplemental Brief, 3/21/13, Exhibit D. Dr. Farag reiterated his psychiatric opinion that it was unlikely that Sullivan would ever be able to participate in a deposition or testify in a trial regarding the car accident because of the risk of suicide. *Id.*

On April 10, 2013, Judge Bertin denied the motion to compel Sullivan's deposition and granted Sullivan's motion for a protective order.

Judge Bertin ordered additionally that "in the event of an **improvement** in Patrick Sullivan's **medical condition** prior to trial, Patrick Sullivan may not testify at trial unless he first appeared and submitted to a deposition in this action." Order, 4/10/13, at unnumbered 1–2 (emphases added).[2]

The Estate lodged two objections to the propriety of the original issuance of the protective order.[3] In its Pa.R.A.P. 1925(b) statement of errors complained of on appeal, the Estate asserted:

> 1. The Court committed an error regarding Patrick Sullivan in [the] following ways:
>
>> a. The Court committed an error in granting a protective order regarding Patrick Sullivan.
>>
>> b. The Court committed an error in considering unsubstantiated out of court statements in granting a protective order.

Estate's Pa.R.A.P. 1925(b) statement, 11/5/14, at 1.

Pennsylvania Rule of Civil Procedure 4012 governs the procedures for seeking a protective order and provides, *inter alia*:

---

[2] On April 19, 2013, the Estate filed a motion pursuant to 42 Pa.C.S. § 702(b) to amend Judge Bertin's April 10, 2013 order to include the certification required for a permissive interlocutory appeal. Judge Bertin denied the motion on May 7, 2013. On May 23, 2013, the Estate filed a petition for review of Judge Bertin's order refusing to amend the April 10, 2013 order in this Court. By *per curiam* order dated June 28, 2013, the petition for review was denied. **Estate of Bouher v. Giftwares, Inc., et al**, 66 EDM 2103 (Pa. Super. 2013).

[3] The remaining four challenges relate to the trial court's denial of Sullivan's motion to lift the protective order discussed *infra*.

(a) Upon motion by a party or by the person from whom discovery or deposition is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person from unreasonable annoyance, embarrassment, oppression, burden or expense, including one or more of the following:

(1) that the discovery or deposition shall be prohibited;

(2) that the discovery or deposition shall be only on specified terms and conditions, including a designation of the time and place[.]

Pa.R.C.P. 4012(a)(1)(2).

While Pennsylvania appellate courts have yet to define the "good cause" requirement, "a party seeking a protective order must, at the very least, present some evidence of substance that supports a finding that protection is necessary. Such evidence must address the harm risked. . . ." *Dougherty v. Heller*, 97 A.3d 1257, 1267 (Pa. Super. 2014) (*en banc*), *appeal granted in part*, 109 A.3d 675 (Pa. 2015).[4] With respect to a court's role in granting a protective order, we have recognized that no "hard-and-fast" rules govern how courts decide a motion for a protective order.

_____

[4] In **Dougherty**, the February 4, 2015 order granting the petition for allowance of appeal, one issue before the Supreme Court certified as:

[w]hether the Superior Court's *en banc* ruling below, that affirmed the trial court's order denying protective relief under Pa.R.C.P. 4012, should be reversed because (a) the ruling now elevates the burden of proving "good cause" in Pa.R.C.P. 4012 matters to a practically unattainable level. . . .

**Dougherty v. Heller**, 109 A.3d 675 (Pa. filed February 4, 2015).

*Hutchison v. Luddy,* 606 A.2d 905, 908 (Pa. Super. 1992). "'Whether to grant or deny the motion, and what kind or kinds of protective orders to issue are matters that lie within the sound judicial discretion of the court. . . .'" *Id*. (quoting *Allegheny West Civic Council, Inc. v. City Council of the City of Pittsburgh*, 484 A.2d 863, 866 (Pa. Commwlth. 1984)).

The trial court, Honorable Carolyn T. Carluccio, determined that the record contained sufficient evidence to support Judge Bertin's issuance of the protective order, namely, Sullivan's mother's testimony and Dr. Farag's letters. Trial Court Opinion, 2/23/15, at 15. The court also found it significant that the Estate represented that it did not need to depose Sullivan because it had ample evidence from the criminal proceedings and social media to cross-examine Sullivan at trial. *Id*. at 13–14. The trial court then rejected the Estate's contention that the protective order protected only Sullivan's deposition testimony and that his trial testimony was governed by Pa.R.E. 601—competency. The trial court concluded that Rule 601 was not relevant to Judge Bertin's ruling because there was no claim that Sullivan was not competent to testify. *Id*. at 14.

An exercise of discretion by a trial court whether to grant or deny motions for protective orders may not be overturned by an appellate court because the latter is persuaded that it might have taken a different action. *Allegheny West*, 484 A.2d at 866. Whether to grant or deny the motion

for a protective order lies within the sound judicial discretion of the court; the court's determination as to these matters will not be disturbed unless that discretion has been abused. *Hutchinson*, 606 A.2d at 908. An abuse of discretion is not merely an error of judgment; it is judgment which is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will as shown by evidence of record. *Fanning v. Davne*, 795 A.2d 388, 393 (Pa. Super. 2002) (citation omitted).

In its appellate brief, the Estate raises three points of error regarding the issuance of the protective order: 1) its constitutional right to confront and cross-examine another party and call relevant witnesses at trial was violated; 2) the trial court lacked the authority and factual record to make a finding concerning Sullivan's medical condition; and 3) the trial court erred in failing to address Sullivan's competency. Estate's Brief at 27–35.

At the outset, we are compelled to determine which of these arguments has been properly preserved for appellate review. *See Commonwealth v. Hill*, 16 A.3d 484, 494 (Pa. 2011) (appellate courts may *sua sponte* determine whether issues have been properly preserved under Pa.R.A.P. 1925)). Our concern is focused on issue one, the constitutional argument, and issue three, competency.

The Supreme Court of Pennsylvania held in *Commonwealth v. Lord*, 719 A.2d 306 (Pa. 1998), that "from this date forward, in order to preserve their claims for appellate review, [appellants] must comply whenever the

trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to Rule 1925. Any issues not raised in a 1925(b) statement will be deemed waived." *Id.* at 309. Subsequently, in *Commonwealth v. Castillo*, 888 A.2d 775 (Pa. 2005), the Supreme Court voiced its displeasure with "decisions of the intermediate courts to the extent that they have created exceptions to *Lord* and have addressed issues that should have been deemed waived." *Castillo*, 888 A.2d at 780 (citations omitted). Thus, Pennsylvania jurisprudence is now well-settled that Rule 1925(b) sets out an unambiguous rule that any issues not raised in the 1925(b) statement will be deemed waived. *Hill*, 16 A.3d at 494. *See also In re Estate of Daubert*, 757 A.2d 962, 963 (Pa. Super. 2000) (an issue not identified for review in a Rule 1925(b) statement is waived whether or not the lower court actually addresses the issue in an opinion).

The Estate did not include the constitutional or competency claims in its Rule 1925(b) statement. Even though the trial court addressed the issue of Sullivan's competency in its opinion, we are constrained to conclude that both issues are waived. *See* Pa.R.A.P. 1925 (b)(4)(vii) (issues not included in the 1925(b) statement are waived).[5]

---

[5] Absent waiver, the Estate's competency argument is without merit. As the trial court correctly recognized, Sullivan never claimed that he was incompetent to testify under Pa.R.E. 601 and Rule 601 considerations did not reason Judge Bertin's decision to impose the protective order. Trial Court Opinion, 2/23/15, at 14–15.

We turn to the Estate's remaining argument that Judge Bertin's order granting the protective order was not supported by evidence of good cause. Specifically, the Estate contends that Sullivan failed to present any admissible or relevant evidence from which Judge Bertin could issue a ruling based on Sullivan's medical condition. The Estate characterized Mrs. Sullivan's testimony as revealing scant knowledge of Sullivan's current medical condition. The Estate's primary objection to the evidence considered by Judge Bertin, however, focuses on the letters submitted by Dr. Farag. The Estate contends that the letters themselves were inadmissible hearsay and that Dr. Farag's failure to testify at the hearing precluded the Estate from cross-examining him as to the basis for his medical opinion. Additionally, the Estate disputes that the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), 29 U.S.C. § 1181 *et seq.*, precluded Dr. Farag from testifying at the hearing, and criticizes the trial judge for her conclusory statement that HIPPA prohibited Dr. Farag's live testimony. *See* Trial Court Opinion, 2/23/15, at 9 n.3 ("Due to HIPPA constraints, Dr. Farag could not provide live testimony.").

We observe that the Estate has raised some colorable arguments regarding the proper admission and evidentiary value of Dr. Farag's letters, and whether HIPPA's restrictions are overridden when a party puts his mental state at issue. We need not address these issues, however, because

the Estate was not prejudiced by the issuance of the protective order, even if granted in error.

To constitute reversible error, an evidentiary ruling must not only be erroneous, but must harm or prejudice the complaining party. *Parr v. Ford Motor Co*., 109 A.3d 682, 690–691 (Pa. Super. 2014) (quoting *Winschel v. Jain,* 925 A.2d 782, 794 (Pa. Super. 2007)). We have also upheld a trial court's decision that the improper exclusion of evidence is harmless error when the testimony sought is cumulative. *Potochnick v. Perry*, 861 A.2d 277, 282 (Pa. Super. 2004).

At the hearing on the protective order motion, the Estate advised Judge Bertin that:

> [The Estate] as a general proposition do[es] not consider it critical to their case that they depose Mr. Sullivan because [the Estate has] his statement to the police, they have his testimony [from Sullivan's guilty plea proceeding] and [it has] testimony [from] the sentencing hearing, and statements in the press, and statements on Twitter, and statements on Facebook, and a myriad of other places where we have evidence that would be of value in preparing for [Sullivan's] examination at trial.

N.T. (Protective Order Hearing), 1/18/13, at 87–88.

On appeal, the Estate acknowledges reciting the statement quoted above but explains that it was uttered prior to the trial court's later exclusion of most of the Estate's expert witness testimony. This explanation, however, is of no import. We assess whether the ruling under scrutiny was proper when it was issued and not by how later events might have impacted

- 15 -

it. Therefore, the Estate's claim that Judge Bertin erroneously granted Sullivan's motion for a protective order is unavailing.

The Estate next challenges the trial court's dismissal of its motion to lift the protective order. On September 10, 2014, approximately one month before trial was scheduled to begin, the Estate filed a motion to lift the protective order precluding Sullivan's testimony. In its motion, the Estate asserted that it had evidence of improvement in Sullivan's mental condition and requested the trial court to order Sullivan to make himself available for a deposition.

A hearing on the motion to lift the protective order was held on September 15, 2014. At the outset of the hearing, the trial court identified "an improvement in [Sullivan's] medical condition" as the basis for modification of Judge Bertin's protective order. N.T. (Motion *In Limine* Hearing), 9/15/14, at 8. The Estate represented that it intended to offer medical testimony that would support lifting the protective order. *Id*. The Estate then proffered evidence that Sullivan was enrolled in a college class on Death and Dying, that Sullivan was interacting with the Probation Department, and that Dr. John O'Brien, a forensic psychiatrist, was available to testify that the record did not support Sullivan's PTSD diagnosis, in part, because of changed circumstances in Sullivan's life. *Id*. at 23, 26. According to the Estate's motion to lift the order, Dr. O'Brien offered that it was "impossible . . . to consider the validity of an opinion from another

purported 'expert'" without knowledge of the subject's testing or exposure to the expert's testimony. Motion to Lift Protective Order, 9/10/14, at 7 ¶ c. With this caveat, the Estate described Dr. O'Brien's estimation regarding Sullivan's current ability to testify, as follows:

> While [Dr. O'Brien] has no way of knowing the severity, if any, of [Sullivan's] PTSD now or at the time of the hearing before Judge Bertin one year and 8 months ago, he said in exact quote: "[Estate's counsel], your instincts are exactly right. If this guy feels he can voluntarily participate in a class on "Death and Dying" without there being suicidal ideation, then he certainly can testify in court as to his part in killing another person.

*Id*. at ¶ d.

After considering the Estate's proffer that Sullivan's medical condition had changed, and entertaining argument, the trial court dismissed the motion to lift the protective order because the Estate failed to tender evidence showing an improvement in Sullivan's medical condition. N.T. Motion *In Limine* Hearing, 9/15/14, at 34. The trial court further explained the basis for its ruling in its Pa.R.A.P. 1925(a) opinion:

> Indeed, [the Estate's] proffer presented nothing new. [The Estate] alleged that Sullivan would take a course on death and dying, but Sullivan was already taking college courses. Moreover, [the Estate] had no evidence to support [its] quantum leap that if a person takes a death course, that person is emotionally strong. Finally, the death course did not reflect a present change in circumstances, it presented a possible, speculative, future change in circumstance. Sullivan was not taking the course at the time of the Motion to Amend the Protective Order. He was merely signed up for the course. All sorts of scenarios could occur which would result in Sullivan never taking the course, making [the Estate's] assertion premature at best. Therefore, [the Estate] proffered no relevant

- 17 -

evidence to warrant a hearing on their Motion to Lift the Protective Order, and the court properly dismissed the same[.]

Trial Court Opinion, 2/23/15, at 23.[6]

On appeal, the Estate urges that it was error for the trial court to require medical evidence to support its assertion of changed circumstances relative to Sullivan's mental condition. The Estate claims that there is no legal requirement that it produce medical evidence, particularly because there was no medical evidence to override. The underlying rationale for this argument appears to be the Estate's characterization of Dr. Farag's letters as inadmissible hearsay.

We discern no abuse of discretion in the trial court's dismissal of the motion. Judge Bertin's initial ruling on the protective order allowed for reconsideration of its issuance "in the event of improvement in [Sullivan's] medical condition." Order, 4/10/13, at unnumbered 1. Thus, it was Judge Bertin's language that required evidence of a change in Sullivan's mental

_____

[6] The trial court also concluded that even if its decision in this regard was improper, the Estate was not prejudiced by the court's evidentiary rulings for three reasons—the Estate's counsel had previously indicated that Sullivan's testimony was not crucial, the Estate had settled with Sullivan, and the Estate's expert witnesses asserted that they did not need Sullivan's testimony in order to opine on Giftwares' and the Railroads' liability. Trial Court Opinion, 2/23/15, at 24–25. The Estate's settlement with Sullivan however, occurred after the trial court's ruling on the motion to lift the protective order. We have faulted the Estate for referring to events subsequent to Judge Bertin's ruling in its argument concerning the propriety of the underlying protective order; so too the trial court incorrectly relied on an ensuing event in concluding that the Estate was not prejudiced by its dismissal of the motion to lift the protective order.

health, not the trial court's imposition of an incorrect legal standard, as the Estate propounds. Additionally, we agree with the trial court that Sullivan's enrollment in the Death and Dying course, an anticipatory, not an actual event, coupled with the acknowledgment from the Estate's expert that he could not opine on whether Sullivan's condition had improved, was not sufficient evidence of changed circumstances that would justify lifting the protective order. Therefore, the Estate's claim of error on this evidentiary ruling cannot succeed.

### *Frye* **Hearing**

Pennsylvania adheres to the ***Frye***[7] test, which provides that novel scientific evidence is admissible "'if the methodology that underlies the evidence has general acceptance in the relevant scientific community.'" ***Commonwealth v. Walker***, 92 A.3d 766, 789–790 (Pa. 2014) (quoting ***Grady v. Frito–Lay, Inc.***, 839 A.2d 1038, 1044 (Pa. 2003)). ***Frye*** is likewise applicable when scientific methods are utilized in novel ways. ***Betz v. Pneumo Abex LLC, et al.***, 44 A.3d 27, 53 (Pa. 2012) (quoting ***Grady***, 839 A.2d at 1045).

On September 5, 2014, Giftwares filed motions *in limine* to preclude the expert reports and trial testimony of the Estate's experts, Batterman

---

[7] ***Frye v. United States***, 293 F. 1013 (D.C. Cir. 1923).

and Kolmus.[8] The Estate proffered Batterman as an accident reconstruction expert to provide an opinion related to the manner in which Giftawares parked its trailers, the crush damage to Sullivan's vehicle, the impact speed of Sullivan's vehicle, the role that the railroad tracks contributed to the loss of control of the vehicle, and the hazards posed by Giftwares' maintenance of the trailer parking area. Giftwares' Motion *In Limine* to Preclude Batterman's Report and Testimony, 9/5/14, Exhibit G (Batterman's Expert Report). Kolmus, a forensic investigator, was retained to "examine the incident site and review the submitted material to determine whether the incident roadway and its appurtenances were maintained in accordance with engineering standards and practice." Giftwares' Motion *in Limine* to Preclude Kolmus's Report and Testimony, 9/5/14, Exhibit G (Kolmus's Report).

As to Batterman, Giftwares claimed that his expert report was "unique in the context of a **Frye** determination in that its failures are not due to its reliance on *unreliable* evidence but are rather due to its complete lack of scientific or technical foundation whatsoever." Giftwares' Motion *in Limine* to Preclude Batterman's Report and Testimony, 9/5/14, at 7 (emphasis in original). Regarding Kolmus, Giftwares argued that his expert report could not assist a jury because the report "provides no explanation as to how the conclusions were reached. . . ." Giftwares' Motion *in Limine* to Preclude

---

[8] The Railroads joined in Giftwares' motion.

Kolmus's Report and Testimony, 9/5/14, at 11. Giftwares also contended that Kolmus's report "fails to identify any methodology or technical considerations let alone those accepted by the scientific community." *Id*. The Estate filed a response to both motions asserting that the *Frye* standard is not applicable because "[t]here is no novel science or theory behind any of the reports of [the Estate's] experts." Estate's Omnibus Response to Defendant's Motions Regarding Plaintiff's Expert Witnesses, 9/12/14, at 4.

On September 15, 2014, the trial court held a hearing wherein Giftwares informed the court that its "*Frye* motion" was based primarily upon its position that Batterman "didn't use a methodology that's generally accepted in a number of areas in his report." N.T. (Motion *in Limine* Hearing), 9/15/14, at 64. Giftwares summarized Batterman's report as accepting "all of Detective Turner's[9] observations and opinions with regard to the happening of this accident." *Id*. at 65. Giftwares then referred to Batterman's opinion that "the impact speed of the [vehicle] with the trailer was in the range of 38 to 43 miles per hour" and criticizes the conclusion because they had "no idea what methodology he uses to come to this conclusion. What [we] believe Dr. Batterman does is he relies upon all of Detective Turner's opinions and his review of the physical evidence and then

_____

[9] Detective M. Robert Turner was a Montgomery County Detective and collision reconstructionist who investigated the accident and prepared a report in preparation of the criminal case.

some way comes up with pre-impact speed." *Id*. at 65–66. Giftwares' argument continued: "[T]here is really no scientific basis or methodology that's been provided with regard to Batterman and coming up to a speed analysis at the point of impact." *Id*. at 68.

Regarding Kolmus, Giftwares stated: "Mr. Kolmus, unlike Mr. Batterman, has absolutely no scientific reasoning. He just has bald opinions. . . . [T]here is nothing to look at from a *Frye* standard to determine a methodology." N.T. (Motion *in Limine* Hearing), 9/15/14, at 101. Giftwares then conceded, "[We] can't even argue that the methodology isn't generally accepted because there isn't a methodology. . . ." *Id*. at 102.

The Railroads offered the following rationale for joining in Giftwares' motions *in limine*: "We have Batterman's report and we have the Kolmus report. They are just the same without any foundation that Sullivan left this roadway as a result of facts beyond his control or situations beyond his control." N.T. (Motion *in Limine* Hearing), 9/15/14, at 74. The Railroads further explained its objection to the experts: "[W]ithout Sullivan's testimony as to why he left the roadway there is simply no foundation for the expert's opinion. An opinion without fact violates *Frye*, the same as an incorrect arithmetical calculation." *Id*. at 82. After some discussion about a discrepancy in Detective Turner's testimony as to the speed of the vehicle on the day of the accident and Batterman's assessment of the speed, the Estate

contended: "[T]hat's not **Frye**. [Batterman's] opinions are based on well-known science of accident reconstruction. Did he apply the science correctly? That's for cross-examination." **Id**. at 79.

At the conclusion of the hearing, the trial court determined that a **Frye** hearing was necessary for Batterman and Kolmus to "present their methodology." **Id**. at 132. The trial court memorialized its decision in an order filed September 25, 2014, directing all parties to appear "for a **Frye** hearing challenging the methodology of [the Estate's] expert witnesses, [Batterman and Kolmus]." Order, 9/25/14, at 2. Subsequently, on September 30, 2014, the Estate filed a memorandum of law substantiating its position that the decision of the court to hold a **Frye** hearing was inappropriate because its expert witnesses utilized non-novel science, and the opposing parties were simply objecting to the witnesses' conclusions.

After what can only be described as a torturous back-and-forth regarding scheduling, the **Frye** hearing was held on October 1, 2014. At the outset of the hearing, there was some discussion between the Estate and the trial court as to the correct procedural posture of the hearing. The Estate offered that, because the trial court had ordered a **Frye** hearing, it had impliedly ruled that that novel science was involved. The Estate thus contended that it carried the initial burden on the question of the novelty of the science employed by its experts. **Frye** Hearing, 10/1/14, at 6. The trial court disputed this characterization, and opined: "[T]he defense has alleged

that there was no methodology put forward. So we don't even get to the novelness [sic] of it until there's a methodology outlined." ***Id***. at 6. The Estate then proceeded to question Batterman as to his credentials, background, and published articles in the area of accident reconstruction. In the context of this questioning, Batterman explained: "Automobile construction is nothing more than the application of Newton's law of mechanics to the physical facts which may be left at an accident scene by an automobile or automobiles." ***Id***. at 31. When the Estate later posed the quintessential question about the scientific principles utilized by Batterman in the field of study relevant to the litigation, Batterman responded: "[T]he basic principles here are Newton's laws of mechanics which were first promulgated in 1686 and are universal." ***Id***. at 39. Batterman repeated this description after the trial court's direct question to the witness concerning methodology: "The methodology [is] Newton's laws of mechanics applied to the physical facts left at the accident." ***Id***. at 45.

Giftwares commenced its cross-examination of Batterman by stating: "So I'm going to ask you a couple of questions about your conclusions, if you don't mind." ***Frye*** Hearing, 10/1/14, at 50. The Estate objected on the basis that conclusions are not at issue in a ***Frye*** hearing. ***Id***. Although the trial court overruled the objection, the Estate continually objected to the nature of the cross-examination questions as beyond the proper scope of a ***Frye*** hearing. The trial court consistently overruled each objection.

The questioning of Kolmus traveled a more conventional path. The Estate elicited information from the witness regarding his qualifications as an expert in civil engineering. *Frye* Hearing, 10/1/14, at 123–146. Kolmus then explained that he prepared his report based upon depositions, a reenactment video and photographs created by police investigating the accident, a survey, and discovery of the parties. *Id*. at 148. Kolmus also testified that he visited the site at both day and night to evaluate the roadway conditions. *Id*. After he gathered his information, he compared it to "what standards and practice were in the field for the various conditions that I found in the field and from that and from the testimony in evidence, I drew conclusions and eventually opinions." *Id*. at 149–150.

Following the *Frye* hearing, on October 8, 2014, the trial court issued findings of fact, conclusions of law, and an order precluding the bulk of Batterman's expert testimony and Kolmus's testimony in its entirety. The trial court determined that Kolmus's report was "devoid of methodology generally accepted in the civil engineering community, and/or provides lay opinion, and/or renders legal conclusions, and/or fails to cite facts upon which the opinion is based." Order, 10/8/14, at 23. As to Batterman, the trial court concluded that his expert opinion as to the manner in which Giftwares parked its trailers contributed to the severity of the accident, the impact speed of Sullivan's vehicle, the role that the railroad tracks contributed to the loss of control of the vehicle, and the hazards posed by

Giftwares' maintenance of the trailer parking area, were "not supported by methodology generally accepted in the engineering and biomechanical community." Order, 10/8/14, at 24. Batterman was permitted to offer his opinion that the damage to Sullivan's vehicle "was caused by an underride that resulted in the fatal injuries sustained by Ashley Bouher while she was seated in the vehicle." *Id*. at 25.

In its Pa.R.A.P. 1925(b) statement, the Estate alleged nine trial court errors concerning the applicability of *Frye*, the conduct of the *Frye* hearing, and the trial court's eventual exclusion of the majority of the Estate's experts' opinions. In its Rule 1925(a) opinion, the trial court did not respond to the Estate's general averment that it abused its discretion when it determined that *Frye* applied to the Estate's experts' opinions. As to the appropriateness of the hearing itself, the trial court quoted extensively from the discussion between the Estate and the court as to the procedural mechanics of the hearing, but offered no comment on whether the hearing was conducted properly. Finally, as to its ultimate decision regarding the exclusion of most of Batterman's and all of Kolmus's testimonies, the court referred this Court to its October 8, 2014 findings of fact, conclusions of law, and order "in lieu of reiterating its reasoning herein." Trial Court Opinion, 2/23/15, at 32.

In its appellate brief, the Estate narrows its argument as to whether the trial court erred in ordering a *Frye* hearing and then failed to conduct a

procedurally proper *Frye* hearing. The Estate urges that its experts utilized non-novel science that did not warrant a *Frye* hearing. The Estate also avers that because the trial court inappropriately conducted the hearing, its experts were improperly exposed to cross-examination regarding their conclusions. "'[T]he admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion.'" *Commonwealth v. Safka*, 95 A.3d 304, 307 (Pa. Super. 2014), *appeal granted in part,* 104 A.3d 525 (Pa. 2014) (quoting *Commonwealth v. Harrell,* 65 A.3d 420, 430 (Pa. Super. 2013) (citation omitted)).

The Estate first challenges the trial court's decision to hold a *Frye* hearing. The Estate contends that neither Batterman nor Kolmus intended to offer "novel scientific evidence" requiring a *Frye* hearing; rather its experts utilized standard principles of engineering and physics.

The admissibility of expert opinion is governed by Pennsylvania Rule of Evidence 702. The Rule provides that an expert witness may testify "in the form of an opinion if the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layman" and "will help the trier of fact to understand the evidence or to determine a fact on issue[.]" Pa.R.E. 702(a), (b). The Rule also requires that "the expert's methodology is generally accepted in the relevant field." Pa.R.E. 702(c).

The *Frye* test is part of Rule 702. *Grady*, 839 A.2d at 1043. The test **only** applies where a party seeks to introduce novel scientific evidence from an expert scientific witness, and is not triggered "every time science enters the courtroom." *Trach v. Fellin*, 817 A.2d 1102, 1108–1109 (Pa. Super. 2003) (*en banc*) (emphasis added). Nonetheless, a "reasonably broad meaning should be ascribed to the term 'novel,'" and "a *Frye* hearing is warranted when a trial judge has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions." *Betz*, 44 A.3d at 53. Further, what constitutes novel scientific evidence is decided on a case-by-case basis. *Commonwealth v. Dengler*, 890 A.2d 372, 382 (Pa. 2005).

The *Frye* test is a two-step process. *Commonwealth v. Foley*, 38 A.3d 882, 888 (Pa. Super. 2012). First, the party opposing the evidence must show that the scientific evidence is "novel" by demonstrating "that there is a legitimate dispute regarding the reliability of the expert's conclusions." *Id.* **If the moving party has identified novel scientific evidence**, then the proponent of the scientific evidence must show that "the expert's methodology has general acceptance in the relevant scientific community" despite the legitimate dispute. *Id*. (emphasis added); *see also Commonwealth v. Walker*, 92 A.3d 766, 790 (Pa. 2014) ("[O]nce determined to be novel evidence, under *Frye*, the proponent must show that

the methodology is generally accepted by scientists in the relevant field, but need not prove the conclusions are generally accepted.").

Herein, the motions *in limine* and the argument propounding the necessity of the ***Frye*** hearing are profoundly lacking in reference to novel science relied upon by the Estate's experts. Indeed, Giftwares acknowledged in its motions that ***Frye*** is not precisely implicated. Giftwares' motion characterized Batterman's expert report as "unique in the context of a ***Frye*** determination in that its failures are not due to its reliance on *unreliable* evidence but are rather due to its complete lack of scientific or technical foundation whatsoever." Giftwares' Motion *in Limine* to Preclude Batterman's Report and Testimony, at 7 (emphasis in original). Giftwares further argued that Kolmus's expert report "provides no explanation as to how the conclusions were reached. . . ." and "fails to identify any methodology or technical considerations let alone those accepted by the scientific community." Giftwares' Motion *in Limine* to Preclude Kolmus's Report and Testimony, at 11. Later, Giftwares represented during the motion *in limine* hearing that its "***Frye*** motion" was consistent with its position that Batterman "didn't use a methodology that's generally accepted in a number of areas in his report." N.T. (Motion *in Limine* Hearing), 9/15/14, at 64. It is therefore apparent that Giftwares' request for a ***Frye*** hearing was premised on a position that the experts provided no methodology, as opposed to novel methodology, in forming their opinions.

We do not agree that **Frye** applies when the question is a lack of methodology. The fact that **Betz** and **Walker** endorse a broad meaning of "novel" in no way dissipates the requirement that the moving party meet the threshold showing of novelty. **See also Trach**, 817 at 1110 ("[W]e are merely stating the law in Pennsylvania when we state that **Frye** applies only to novel science."). And, while "novel science" has not been defined precisely, even a most lenient definition of the term would not include the concept of "no methodology." Novelty remains the *sine qua non* of the threshold **Frye** inquiry.[10]

The trial court likewise erred in its understanding of the **Frye** inquiry. Despite the moving parties' failure to interject the concept of novel science into its motions and argument, at the conclusion of the motion *in limine* hearing, the trial court decided, without elaboration, that a **Frye** hearing was necessary for Batterman and Kolmus to "present their methodology." N.T. (Motion *in Limine* Hearing), 9/15/14, at 132. While this statement could reasonably be interpreted as the court deciding that a novel science **Frye** inquiry was necessary, at the outset of the **Frye** hearing itself, the trial court made the following statement disclosing its rationale for ordering the

---

[10] The Railroads also displayed a fundamental misunderstanding regarding the necessity of a **Frye** hearing. During the motion hearing, the Railroads asserted: "An opinion without fact violates **Frye**, the same as an incorrect arithmetical calculation." N.T. (Motion *in Limine* Hearing), 9/15/14, at 82. Actually, neither an opinion without fact nor an incorrect calculation implicates **Frye** considerations.

hearing: "[T]he defense has alleged that there was no methodology put forward. So we don't even get to the novelness of it until there's a methodology outlined." *Frye* Hearing, 10/1/14, at 6. Thus, the trial court incorrectly transposed the two-step *Frye* analysis. Rather than requiring the moving party to first demonstrate the utilization of novel science, the trial court inaccurately understood that the methodology itself was the threshold inquiry. This conclusion was in error and requires that we reverse the trial court's decision to conduct a *Frye* hearing.

Having so determined, we need not address the Estate's argument that the trial court failed to conduct a procedurally proper *Frye* hearing. Additionally, because the trial court granted summary judgment in favor of Giftwares and the Railroads when the Estate conceded that it could not prove causation without its experts, the award of summary judgment must also be reversed and the matter remanded. This conclusion, however, does not end our review. As the matter is to be remanded, we must address the Estate's final argument that the trial judge should have recused herself because she was unable to overcome her bias against the Estate's counsel.

### Recusal

The Estate filed and served its recusal motion at the *Frye* hearing held on October 1, 2014. The motion alleged that a series of rulings against the Estate, *i.e.*, the refusal to lift the protective order, the handling of the *Frye* hearing, and the language employed by the court in a scheduling order

demonstrated that the trial court was unfairly biased. The trial court read the motion and denied it.

In its Pa.R.A.P. 1925(b) statement, the Estate alleged the following errors in the trial court's denial of its recusal motion:

3. The Court committed an error in failing to correct the record and an order of the Court dated September 24, 2014 that the Court issued upon motion by Plaintiffs to do so. Said order deliberately distorted the record in an effort to make it appear as if Plaintiffs were non-compliant, which was demonstrably untrue and Plaintiffs in written motion asked the Court to correct the erroneous order.

4. The Honorable Carolyn T. Carluccio committed an error regarding her recusal from the matter in the following ways.

a. The Honorable Carolyn T. Carluccio committed a clear error in failing to even consider Plaintiffs' motion for recusal properly.

b. The Honorable Carolyn T. Carluccio committed an error by failing to even read Plaintiffs' motion for a recusal prior to denying it.

c. The Honorable Carolyn T. Carluccio committed an error by failing to properly consider the standard for recusal.

d. The Honorable Carolyn T. Carluccio committed an error, severely abused her discretion, and denied Plaintiffs due process of law, by continuing to preside over this matter despite overwhelming evidence of her bias against Plaintiffs.

Estate's Pa.R.A.P. 1925(b) statement, 11/5/14, at 3–4.

The trial court concluded that the recusal motion was time-barred because it was not raised "at the earliest possible moment. . . ." Trial Court Opinion, 2/23/15, at 38. It also proposed that the issue was waived

because the Estate did not object to the denial of the motion on the record. *Id*. at 39. On the merits, the trial judge noted that "[a]dverse rulings, without more, do not demonstrate the bias," and that "a trial judge's efforts to maintain orderly proceedings in the courtroom, in the face of the Appellant's acknowledged intransigence and impertinence fall far short of proof of bias." *Id*. at 41 (citations omitted).

Our standard of review for a denial of recusal is well settled. The Pennsylvania Supreme Court presumes that this Commonwealth's judges are "honorable, fair and competent," and, in response to a recusal motion, are able "to determine whether they can rule impartially and without prejudice." *Commonwealth v. Druce*, 848 A.2d 104, 109 (Pa. 2004). The party advocating recusal must produce evidence establishing bias, prejudice, or unfairness necessitating recusal, and the "decision by a judge against whom a plea of prejudice is made will not be disturbed except for an abuse of discretion." *Id*. at 108 (quoting *Commonwealth v. Darush*, 459 A.2d 727, 731 (Pa. 1983)). *See also Becker v. M.S. Reilly, Inc.*, __ A.3d __, 2015 PA Super 171 at * 1 (Pa. Super. 2015) (filed August 13, 2015) ("We review the trial court's denial of the recusal motion for abuse of discretion.").

On appeal, the Estate claims that the trial court's bias was exhibited by the following:

- Accommodating Defense Counsel for "big client meetings" by moving hearings 24 hours, yet refusing to move a hearing thirty (30) minutes for Plaintiffs' Counsel's childcare, or for Plaintiffs' Counsel wife's surgery.

- Issuing a blatantly false Order (and not correcting it even upon oral notice and a written motion) painting Plaintiffs' Counsel in a negative light.

- Refusing to enforce Plaintiffs' Counsel's subpoenas while threatening to sanction the "Plaintiffs" should their experts not appear, making Mrs. Bouher cry when counsel told her.

- Conducting a "Frye Hearing" without any justification and hijacking Plaintiffs' ability to properly present evidence for a hearing that should never have occurred costing [P]laintiffs' counsel tens of thousands of dollars in costs and time.

- The redrafting of a court order to ensure that Plaintiffs' Counsel was no longer in compliance with the Order.

- Essentially adopting (often verbatim) whatever positions Defendants wanted her to with regard to Defendant Sullivan and Plaintiffs' experts, regardless of whether there was a basis.

- Consistently berating Plaintiffs' Counsel for being difficult or recalcitrant when Plaintiffs' Counsel worked diligently to do everything asked of them.

Estate's Brief at 53–54 (emphasis in original).

Preliminarily, the Estate's allegations of bias traceable to the trial court's failure to consider its scheduling conflicts, the trial court's refusal to enforce the Estate's subpoenas, and the trial court's acceptance of the opposing parties' positions, are waived for failure to include these claims in its 1925(b) statement. *See* Pa.R.A.P. 1925 (b)(4)(vii) (issues not included in the 1925(b) statement are waived). The Estate's remaining allegations of trial court bias fall into two categories—its rulings were not consistent with Pennsylvania law or procedure and the hostility that the Court evidenced against the Estate's counsel.

As to the procedural concerns related to the motion, we first conclude that the Estate presented its recusal motion in a timely manner. Secondly, there is authority to support a finding of waiver for failure to note an objection on the record following the trial court's denial of the motion. **See Commonwealth v. King**, 990 A.2d 1172, 1180 (Pa. Super. 2010) (holding that recusal argument was waived when the appellant did not object after judge refused to recuse himself). However, even if properly preserved, the Estate would not be entitled to relief on the merits.

The Estate's contention that the trial court's bias was reflected in its rulings is not cognizable. As observed by the trial court, "a mere adverse ruling, without more, does not demonstrate the bias required for a recusal to be granted." **In re In the Interest of S.H.**, 879 A.2d 802, 808 (Pa. Super. 2005) (quoting **Arnold v. Arnold**, 847 A.2d 674, 681 (Pa. Super. 2004)). Additionally, the Estate has presented its substantive objections to the trial court's rulings to this Court in this appeal in which we have independently reviewed and decided.

The Estate also claims that certain of the trial court's on-the-record statements and language in her 1925(a) opinion evidence open hostility to the Estate's counsel. The Estate also submits *de hors* the record information concerning the historic animosity between the trial court and counsel.

We have reviewed the trial court's comments that the Estate cites as evidence of trial court bias. While the exchanges between the court and the

Estate's counsel were often less than a model of professional civility, they did not rise to the level demonstrating either trial court bias or the appearance of bias requiring recusal. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." **Commonwealth v. Kearney**, 92 A.3d 51, 61 (Pa. Super. 2014) (quoting **Liteky v. United States**, 510 U.S. 540, 555–556 (1994)). The trial court's statements and decisions that the Estate refers to as examples of bias are more correctly understood as the trial court's attempt to maintain order in her courtroom. Accordingly, there was no abuse of discretion in her decision to deny the recusal motion.

For the reasons explained above, we affirm the trial court's rulings on the motion granting the protective order regarding Sullivan, the denial of the Estate's motions to lift the protective order, and the denial of the Estate's motion for recusal of the trial court. We reverse the trial court's decision to conduct a **Frye** hearing and the order awarding summary judgment to Giftwares and the Railroads.

Order granting summary judgment reversed. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judge Wecht joins the memorandum.

Judge Donohue Concurs in the Result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/23/2015</u>