J-A06038-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

v.

SEAN JOSE RAIN JR.

Appellant

:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 770 WDA 2023

Appeal from the PCRA Order Entered June 20, 2023
In the Court of Common Pleas of Mercer County Criminal Division at
No(s):  CP-43-CR-0001331-2018

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: MAY 31, 2024**

Sean Jose Rain Jr. ("Rain") appeals from the order entered by the Mercer County Court of Common Pleas dismissing his petition pursuant to the Post Conviction Relief Act ("PCRA").[1]  On appeal, Rain raises a litany of claims asserting the ineffectiveness of his trial counsel.  Because we conclude that his claims either lack merit or are waived, we affirm.

A prior panel summarized the factual and procedural history of this case:

> On June 23, 2018, at approximately 3:00 A.M., the Sharon Police Department was dispatched to a shots fired call in the 100 block of South Myers Ave. in the City of Sharon, Pennsylvania. Upon arrival, officers discovered a deceased male identified as Trivoune R. Craig (hereinafter "Victim") seated in the front driver seat of his own car.  Victim had sustained multiple gunshot wounds to his face.  N.T.[], 6/12/19, A.M. session, at 26.

---

[1]  42 Pa.C.S. §§ 9541-9546.

Antonio Volpe resides at 54 South Myers Avenue and testified that … he woke up around 2:42 a.m. to three or four gunshots on the day of the incident. Mr. Volpe went to his living room and looked out his living room's window to see Victim's vehicle across the street with its lights on. Mr. Volpe walked outside on to his front porch and called out and asked if everyone was okay. No one responded. … Mr. Volpe called 911 to report the incident. The Commonwealth admitted into evidence Mr. Volpe's 911 call. During the 911 call, Mr. Volpe stated he heard voices arguing before the gunshots went off. N.T.[], 6/11/19, P.M. session, at 34-35, 37-38.

[Rain]'s aunt, Ashley West [("West")], and her paramour, Donta Bell [("Bell")], lived at 70 South Myers Avenue, which was two "houses apart from" Volpe's residence at 54 South Myers Avenue. [*Id.*] at 5. The trial court summarized their trial testimony:

[Bell] testified that on the day of the incident he was downstairs playing video games when he heard two (2) gunshots in the early morning hours. [Bell] went upstairs to check that [West] and her son were okay. Upon returning downstairs, [Bell] heard a knock at his door. [Bell] then peeked through the peephole to see [Rain] standing outside. [Bell] opened the door and [Rain] walked right in without saying anything to [Bell]. N.T.[], 6/13/19, P.M. session, at 9-12.

After walking into [Bell]'s residence, … [Rain] immediately walked back towards the kitchen area. [Bell] asked [Rain] "what's going on." [Rain] responded, "it's cool, Unc."

\*　　\*　　\*

As [Bell] was walking away from [Rain], [Rain] made a comment about someone disrespecting [Rain]'s cousin Bubby. Bubby had been murdered sometime in the past and [Rain] was extremely close to him. [Bell] then went upstairs and told [West] that she had to go downstairs and talk to [Rain]. [*Id.*] at 14-17.

[West] testified that she awoke in the early morning hours on the day of the incident to a commotion. When she first talked to [Bell], [he] "seemed a little frantic, like something was wrong." [West] … observed [Rain] inside her … kitchen. [Rain] then went to the laundry room, took off his clothes, including blue jeans, put

- 2 -

them in the washing machine, and added detergent and bleach. N.T.[], 6/13/19, A.M. session, at 86-87, 89-90.

[Rain] stated to [West] "something along the lines of somebody being gone." After [Rain] … put [his clothes] in the washing machine, [he] retrieved a bag from [West]'s residence that he kept there that had clothes in it. [Rain] then put on the clothes and went up into [West]'s attic. [West]'s attic has no bed but does have a window where [Rain] could look directly at the crime scene below. [*Id.*] at 93-94, 96, 115.

After [Rain] was up in the attic, a Sharon Police Officer knocked on [West]'s door [and asked] if she had heard anything. [West] informed the Sharon Police Officer that she did not hear anything. Additionally, [West] testified that [Rain] was "very close" to their cousin Bubby who had been shot to death. [*Id.*] at 96, 98-99, 104-05.

\*　　\*　　\*

Subsequently, the police searched West and Bell's house and discovered drugs and a 9mm Taurus gun that was licensed to West. N.T.[, 6/13/2019], A.M. session, at 99. Both witnesses "were given immunity for their testimony and there was also an agreement not to pursue any charges against [Bell] or [West]." [*Id.*] at 118.

The Commonwealth also presented the testimony of three individuals who were with [Rain] and Victim on the night of the shooting at TnT Bar in Farrell, Pennsylvania.

Kaleb Shorts [("Shorts")] testified he was at TnT Bar with [Rain], Victim, Daniel Wiley [("Wiley")], and Isaiah Abram [("Abram")], and they all eventually … were hanging outside [sic] rapping. … TnT Bar was closing, and [Abram] was the first person to leave the group by getting picked up. … Victim … retrieved his vehicle, drove to the front of TnT Bar and asked if anybody needed a ride home. [Shorts] … declined but [Rain] and [Wiley] got into Victim's vehicle. N.T.[], 6/12/19, P.M. session, at 5, 7-9.

[Abram] is Victim's cousin. [Abram] testified that [w]hen TnT Bar was closing, … Victim and he went outside and were hanging out with [Rain] and [Wiley]. … [Abram] and [Rain] were rap battling each other and during the rap battle, [Rain] lifted his

- 3 -

shirt with his arm to expose a dark object located in [his] waist area. When [Rain] let his shirt fall back down, [Abram] could no longer see the same dark object. [Abram] testified that he was picked up by his girlfriend and went home. [*Id.*] at 60-65.

[Wiley] testified that he was at TnT Bar around the time it closed with [Rain], Victim, and [Abram]. When it was time to leave, [Wiley] … got into [] Victim's vehicle to get a ride home. [Rain] started talking to Victim and then entered the backseat. Victim dropped off [Wiley], who lived very close to TnT Bar. Upon [Wiley] exiting Victim's vehicle, [Rain] got in the front seat. [*Id.*] at 27-30, 32.

The Commonwealth also presented several surveillance videos:

TnT Bar provided surveillance video from multiple camera angles which were shown to the jury. One video showed [Rain] interacting with various people. Sharon Police Department Captain Travis Martwinski [("Captain Martwinski")] testified that [Rain] was exhibiting signs of printing, which he explained was "carrying a concealed firearm."

\* \* \*

N.T.[, 6/12/2019], P.M. session, at 79, 81-82, 100, 105-06.

Furthermore, Captain Martwinski testified that the surveillance video inside TnT Bar showed [Rain] with a large bulge in his waistband on the right side of his shirt. [*Id.*] at 104.

\* \* \*

[Rain] was detained, and on June 24, 2020 — the day after the shooting — police administered a gun residue test, N.T.[, 6/13/2019], P.M. session, at 49, 51, which indicated the presence of gunshot residue on both of [his] hands. Trial Ct. Op. at 11, *citing* N.T.[, 6/13/2019], P.M. session, at 105. [Rain] was charged with, *inter alia*, criminal homicide, persons not to possess a firearm, and carrying a firearm without a license.

On May 10, 2019, the Commonwealth filed a pre-trial motion *in limine*. It explained:

[A]fter Victim's murder, Victim's wife … informed Sharon Police Department that about three (3) to four (4) months prior to Victim's death, their house at 508 Emerson Avenue was shot at. No one reported the incident to the police when it occurred, and no one was ever charged with the shooting. Sharon Police recovered a bullet slug from a cabinet in Victim's house, which did not match the bullets that killed Victim.

Trial Ct. Op. at 13 (emphasis added). The Commonwealth sought to preclude any reference to this incident, arguing it was not relevant, it was overly prejudicial, and it would be confusing to the jury. *Id.* at 12.

The trial court conducted a hearing on June 5, 2019. The parties referred to a report, in which "an individual named [Timothy Crawford ("Crawford")]" told police "[Victim] was having issues with another individual, who apparently had shot at him in the recent past." N.T.[, 6/5/2019], at 9.

\*     \*     \*

[Rain] also cited a report … that Victim "had been having an ongoing issue with" someone named Zach Owens [("Owens")]. *Id.* at 11. [Rain] argued he should be permitted "to explore other suspects" who were not investigated for "very recent past … attempts on Victim's life." *Id.* at 9. The Commonwealth responded that although, following Victim's death, there were "a couple names thrown out as to who may have had problems with Victim," nothing tied any of those names to the shots fired at Victim's house. *Id.* at 13.

The trial court agreed with the Commonwealth. Two days after the hearing, on June 7, 2019, the trial court granted its request to preclude any evidence relating to the shots fired at [] Victim's house. However, the court provided it would admit such evidence if [Rain] could "establish a factual or evidentiary foundation that" the prior incident was relevant to the instant case. Trial Ct. Op. at 14, citing Order, 6/7/19.

Four days [later], a five-day jury trial commenced. The jury found [Rain] guilty of [first-degree murder] and firearms not to be carried without a license. Separately, the trial court found him guilty of person not to possess a firearm.

J-A06038-24

On September 4, 2019, the trial court sentenced [Rain] as follows: (1) life imprisonment without parole for the murder count; (2) a consecutive 42 to 84 months [in prison] for carrying a firearm without a license; and (3) a concurrent 18 to 36 months [in prison] for persons not to possess a firearm.

***Commonwealth v. Rain***, 407 WDA 2020, 2021 WL 944416 at \*\*1-5 (Pa. Super. Mar. 12, 2021) (non-precedential decision) (original brackets and some internal citations to the trial court opinion omitted).

Rain timely appealed to this Court, which affirmed his judgment of sentence on March 12, 2021. ***Id.*** Our Supreme Court denied his petition for allowance of appeal on October 1, 2021. ***Commonwealth v. Rain***, 264 A.3d 332 (Pa. 2021).

Rain filed a timely PCRA petition in which he raised numerous claims of ineffective assistance of counsel. On January 6, 2023, the PCRA court held a hearing on Rain's petition. On June 1, 2023, the PCRA court issued notice of its intent to dismiss Rain's petition pursuant to Pennsylvania Rule of Criminal Procedure 907, and on June 20, 2023, entered an order dismissing the petition. This timely appeal followed. Both the PCRA court and Rain have complied with Pennsylvania Rule of Appellate Procedure 1925.

Rain's brief is a quagmire in terms of its structure, organization, and readability—it is in many ways difficult to follow and understand. Additionally, the brief violates the Pennsylvania Rules of Appellate Procedure, as it does not contain a statement of the questions Rain raises in his brief pursuant to

Pa.R.A.P. 2116(a).[2]  While we could find Rain's claims waived for his failure to comply with the brief requirements under the Pennsylvania Rules of Appellate Procedure, *see* Pa.R.A.P. 2101 (stating that "if the defects are in the brief … of the appellant and are substantial, the appeal … may be quashed or dismissed"), we decline to do so.  Nevertheless, to aid the readability of this memorandum, we will condense and address related issues together.

We begin by acknowledging our standard of review.  "We review the denial of PCRA relief by examining whether the PCRA court's conclusions are supported by the record and free from legal error."  ***Commonwealth v. Johnson***, 289 A.3d 959, 979 (Pa. 2023).  "[W]e defer to the factual findings of the post-conviction court, which is tasked with hearing the evidence and assessing credibility.  ***Id.***  Our standard of review of a PCRA court's legal conclusions, however, is de novo. ***Id.***

Each of the issues Rain presents for review claim that trial counsel provided ineffective assistance.

---

[2]  Pertinently, Rule 2116(a) provides that "[t]he statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail.  The statement will be deemed to include every subsidiary question fairly comprised therein. No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." Pa.R.A.P. 2116(a).  Although the argument section of Rain's brief includes more than a dozen separate claims of error, the portion of his brief titled "Statement of the Question Involved" states only: "Whether the PCRA Court erred by denying Appellant relief in the form of a new trial based on one or more instances of ineffective assistance of trial counsel (1 (a-e)- 10)?" Rain's Brief at 4.

- 7 -

> It is well-settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different.

*Commonwealth v. Reid*, 259 A.3d 395, 405 (Pa. 2021) (quotation marks and citation omitted). Importantly, a PCRA petitioner must address each of these three prongs on appeal, as the petitioner bears the burden of pleading that counsel provided ineffective assistance. *Id.* This Court, however, need not review claims of ineffective assistance of counsel in any particular order, as the law is clear that "[a] petitioner's failure to satisfy any prong of this test is fatal to the claim." *Id.*

### Ineffective Assistance of Counsel – Alternative Suspect Defense

The first five issues Rain raises on appeal (specifically, the issues he lists as 1A through 1D and 2 in his brief) relate to his claim that trial counsel was ineffective for failing to investigate and develop an alternate suspect defense. *See* Rain's Brief at 21-54. Rain argues that trial counsel was ineffective because he failed to engage a private investigator, Anthony McClure ("McClure"),[3] to assist in gathering information for Rain's defense until approximately three to four weeks prior to trial. *Id.* at 30-34. Rain asserts

---

[3] McClure was formerly an investigator for the Detective Bureau of the Beaver County District Attorney's Office. N.T., 1/6/2023, at 9, 130.

that if trial counsel had engaged McClure at an earlier date, it would have allowed him to properly develop an alternate suspect defense. *See id.* With respect to an alternate suspect defense, Rain points to Crawford, who did not testify at Rain's trial, as the missing component to the defense. *Id.* at 34-47. Rain maintains that Crawford had firsthand information that Victim had an ongoing conflict with Owens and Meco "Magic" Brown ("Brown"), that Crawford was with Owens on the night of Victim's murder, that Owens was carrying a firearm, and that Crawford dropped Owens off in the vicinity of the crime scene. *Id.* Thus, Rain contends, trial counsel was ineffective for failing to call Crawford as a witness at trial. *Id.* Additionally, Rain argues that trial counsel was ineffective because he misconstrued the trial court's granting of the Commonwealths' motion of limine precluding evidence related to the shooting of Victim's house that occurred three to four months prior to his murder. *Id.* at 50-54. Rain asserts that trial counsel wrongly operated under the assumption that the trial court's decision entirely precluded him from calling Crawford and other witnesses, such as Brown, JaJuan Adkins-Holland ("Adkins-Holland"), and Owens, to support an alternate suspect defense. *Id.*

To establish that counsel was ineffective for failing to call a witness, a PCRA petitioner must establish:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Washington*, 927 A.2d 586, 599 (Pa. 2007). Importantly, "[f]ailure to call a witness is not per se ineffective assistance of counsel[.]" *Id.* "To demonstrate … prejudice, the PCRA petitioner must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Johnson*, 966 A.2d 523, 536 (Pa. 2009) (quotation marks and citation omitted).

"Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary." *Id.* at 535. "Counsel's unreasonable failure to prepare for trial is an abdication of the minimum performance required of defense counsel." *Id.* (quotation marks and citations omitted). "The duty to investigate … may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, unless pursuant to a reasonable strategic decision, may lead to a finding of ineffective assistance." *Id.* at 535-36. The Court explained, however, that while "it is per se unreasonable not to attempt to investigate and interview known eyewitnesses in connection with defenses that hinge on the credibility of other witnesses[,]" it does not mean "that such an omission is per se prejudicial." *Id.* at 536 (quotation marks and citations omitted). "Indeed, such a per se failing as to performance … does not make out a case of prejudice, or overall entitlement to … relief." *Id.*

- 10 -

As it relates to trial counsel's failure to investigate, interview, and call Crawford as a witness at trial, and trial counsel's alleged misunderstanding of the trial court's decision on the Commonwealth's motion in limine, Rain has not established that the absence of Crawford's testimony at trial was prejudicial. The record reflects that during the PCRA hearing, Crawford testified as follows:

[Crawford]. I told [the police] I was with [Owens] around the time this incident was supposed to had happened. And that I dropped him off, when I dropped him off. I told him about the conversations that the Abrams are saying happened with [Owens] in between the time of me dropping [Owens] off; me picking him up and dropping him off.

Q. You had personal knowledge of what [Owens] was doing in that timeframe; correct?

[Crawford]. Right. That we -- that he was with me?

Q. Well, not when he was -- well, that he was -- when he was with you, the fact that you dropped him off or whatever, you had some knowledge of what he was doing that night; correct?

[Crawford]. Yes.

Q. As opposed to someone else telling you is what I'm saying.

[Crawford]. Yes.

Q. And is that what you told the police in that statement that you gave?

[Crawford]. Right. That I had knowledge of what he was -- where he was at?

Q. Yeah. And that -- that you had some ideas that maybe he or someone else was involved in this.

[Crawford]. No. I said it could have been a possible because they

- 11 -

–- the Abrams was coming at him over him having problems with [Victim].

* * *

Q. So, you had some background on it also. Is that what you're telling the [c]ourt?

[Crawford]. No. I didn't have no background on it. I – [Victim] and me is, like, related.

Q. Okay. What I'm saying is you had some personal knowledge of not only what [Owens] may have been doing, but also the background between [Owens] and the Abrams, [Victim]. Is that -- is that fair to say?

[Crawford]. Yeah.

* * *

Q. And did you -- did you, in fact, tell the police that you were [Victim]'s cousin?

[Crawford]. Yeah.

Q. Okay. And did you also tell the police that you believed that either [Owens] or Magic Meco Brown were responsible?

[Crawford]. **No. I said I heard that they was responsible**.

Q. Okay. Did the name Sean Jose Rain, Jr. ever come up?

[Crawford]. No.

Q. Were you aware of any problems between [Victim] and Magic Meco Brown?

[Crawford]. No. That's what the Abrams was saying whenever they was coming at [Owens]. I took [Owens] to where the Abrams was at and they was saying that they know that it was either him or whoever Meco, Magic, whatever they call him. I don't know what they call him, but that's what they was saying to [Owens].

- 12 -

Q.  Were they aware of a prior incident regarding [Victim]'s house also?  Weeks or months before?

[Crawford].  Yeah.  They was aware of it.

Q.  Okay.  So, you told the police everything that you knew about; right?  In the statement you gave the detective?

A.  Right.

Q.  What about, umm, [Victim] and Meco getting into it?  Was there also that mention a few weeks prior?

[Crawford].  No, that was mentioned on the day that -- that the incident happened.

Q.  Okay.

[Crawford].  As far as my knowledge.  I'm pretty sure they knew about it because they all hang around each other, but I didn't know about him and Meco until the incident.

\* \* \*

Q.  Who told you about it?

[Crawford].  That's when I heard, when he was talking to [Owens]. He said that him and Meco, Magic -- they call him Magic -- him and Magic had fall outs over a girl, so it was either him -- he thought that it was either Zach or Magic.

N.T., 1/6/2023, at 146-49 (emphasis added).

Crawford's testimony at the PCRA hearing was vague and speculative, and in some respects, nearly incomprehensible.  *See id.*  At best, Crawford's testimony regarding who, other than Rain, may have killed Victim, was conjecture, as there was no testimony that directly pointed to Owens, Brown, or anyone else, as the perpetrator.  *See id.*  Crawford himself did not even testify that he believed Owens or Brown was responsible for the murder, but

- 13 -

rather that he had heard they were responsible. *Id.* Crawford only testified that he dropped Owens off in Sharon on the night of Victim's murder and that he heard, from an unnamed source, that Owens and Brown had issues with Victim. *Id.* Our Court has held that "merely suggesting that someone else may have had a motive is not evidence." *Commonwealth v. Foley*, 38 A.3d 882, 887 (Pa. Super. 2012) (quotation marks and citation omitted). Thus, Crawford's testimony at the PCRA hearing only amounted to speculation and we cannot say, based on the record before us, that trial counsel's failure to investigate and call Crawford as a witness prejudiced Rain.

To the extent Rain argues that trial counsel was ineffective because he did not have Brown, Adkins-Holland, or Owens testify in support of his alternative suspect defense, he is likewise not entitled to relief. None of these witnesses testified at Rain's PCRA hearing and there is no sworn testimony of record from any of these witnesses indicating what they would have testified to at trial. *See Commonwealth v. Pursell*, 724 A.2d 293, 306 (Pa. 1999) (rejecting appellant's ineffective assistance of trial counsel claim for failing to present witnesses at trial, because appellant failed to show that the witnesses would have testified favorably on his behalf). Thus, Rain cannot satisfy the five-part test for establishing ineffective assistance of counsel for failing to call any of these individuals at trial.

Rain has failed to establish that he was prejudiced by trial counsel's failure to investigate, develop, and call witnesses for an alternate suspect

defense. Accordingly, we conclude that issues 1A through 1D and 2 do not entitle Rain to relief.

**Ineffective Assistance of Counsel – TnT Bar's Security Protocols**

In issue 1E, Rain argues that trial counsel was ineffective for failing to investigate the TnT Bar's security protocols. Rain's Brief at 48-49. Rain asserts that had trial counsel conducted such an investigation, he would have been able to establish the improbability of a patron inside the bar carrying a gun. *Id.* Rain, however, has again failed to establish prejudice with respect to this issue. The record contains no evidence regarding TnT Bar's security protocols—Rain did not call any witness to provide this information at the PCRA hearing and the protocols themselves were never presented as documentary evidence to the PCRA court. Thus, we cannot say whether it was possible or not to enter the bar with a firearm. Instead, Rain asks this Court to presume that trial counsel's lack of investigation into the TnT Bar's security protocols was prejudicial. This we cannot do. *See Commonwealth v. Sandusky*, 203 A.3d 1033, 1044 (Pa. Super. 2019) ("[B]oilerplate allegations and bald assertions of … prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective.") (citation omitted). As such, this claim must fail. *See Reid*, 259 A.3d at 405.

**Ineffective Assistance of Counsel – Jury Instruction**

In issue 3, Rain argues that trial counsel was ineffective because he did not object to the trial court's decision to deny his request for Standard Jury

Instruction 4.06, "Certain Testimony Subject to Special Scrutiny."[4]   Rain's

Brief at 54.   Rain argues this jury instruction was necessary because Bell,

West, and Wiley received immunity in exchange for testifying at Rain's trial

and that trial counsel's failure to object to the denial of this jury instruction

precluded him from pursuing the claim on direct appeal.   *Id.*   Rain further

asserts that trial counsel was ineffective for failing to request Standard Jury

Instruction 4.15, "False in One, False in All."[5]   *Id.* at 54-58.   Rain asserts that

this jury instruction would have allowed the jury to disregard the testimony

Wiley, Bell, and West because their testimony lacked credibility.   *Id.*

At trial, the trial court gave the following instructions to the jury

regarding witness credibility:

> As judges of the facts, you are the sole judges of the credibility of
> the witness and their testimony.  This means you must judge the
> truthfulness and accuracy of each witness's testimony and decide
> whether to believe all, part, or none of that testimony.   The
> following are some of the factors that you may and should
> consider when judging credibility and deciding whether or not to
> believe testimony. … Did the witness have an interest in the

---

[4] Standard Jury Instruction 4.06 provides, "[y]ou should examine closely and carefully and receive with caution the testimony of [*name of witness*] [any witness] if you find that he or she [was previously hypnotized] [admitted that he or she committed perjury at another trial] [*give specific situation*]."  Pa. SSJI (Crim) § 4.06 (brackets and italics in original).

[5] Standard Jury Instruction 4.15 states, "[i]f you decide that a witness deliberately testified falsely about a material point, [that is, about a matter that could affect the outcome of this trial,] you may for that reason alone choose to disbelieve the rest of his or her testimony. But you are not required to do so. You should consider not only the deliberate falsehood but also all other factors bearing on the witness's credibility in deciding whether to believe other parts of [his] [her] testimony."  Pa. SSJI (Crim) § 4.15.

outcome of the case, bias, prejudice, or other motive that might affect their testimony? … If you believe some part of the testimony of a witness to be inaccurate, consider the inaccuracy -- consider whether the inaccuracy casts doubt upon the rest of their testimony.

N.T., 6/17/2019, at 91-92.

Thus, the record reveals that while the trial court did not instruct the jury using the precise language of Standard Jury Instructions 4.06 and 4.15, it nonetheless provided the jury with instructions that directly addressed the concerns Rain now raises on collateral review regarding the reliability or credibility of Wiley, Bell, and West. Significantly, the instruction addressed the issue of credibility of the witnesses, and informed the jury that it could disbelieve a witness' entire testimony if it found that any part of the testimony provided by that witness was inaccurate.[6] "[I]t is well[]settled that the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." **Commonwealth v. Kline**, __ A.3d __ 2024 WL 12453302024, *2 (Pa. Super. 2024) (quotation marks and citation omitted). Given the substance of the instruction set forth above that the trial court

_____

[6] The record reflects that during the cross-examination of Bell, West, and Wiley, trial counsel attacked their biases and credibility, given that they were granted immunity in exchange for their testimony in this case. **See** N.T., 6/12/2019 (P.M. session), at 38-46; N.T., 6/13/2019 (A.M session), at 119-57; N.T., 6/13/2019 (P.M. session), at 28-43.

provided to the jury in this case, we cannot say that Rain was prejudiced by trial counsel's failure to object to the denial of the "Certain Testimony Subject to Special Scrutiny" instruction or his failure to request the "False in One, False in All instruction." *See Commonwealth v. Spotz*, 18 A.3d 244, 299 (Pa. 2011) (holding that counsel was not ineffective for failing to object to the jury instructions where the instructions properly explained the law). Rain provides no specific argument that convinces us otherwise. Because Rain does not establish prejudice, his third issue does not entitle him to relief. *See Reid*, 259 A.3d at 405.

### Ineffective Assistance of Counsel – Motion in Limine

In issue 4, Rain argues that trial counsel was ineffective for failing to file a motion in limine to preclude the testimony of the Commonwealth's gunshot residue ("GSR") expert. Rain's Brief at 59-63. Rain takes issue with the fact that the Commonwealth's GSR expert's report detected one particle of gunshot residue on Rain's right hand approximately 36 hours after the Victim's murder, "when detection within six hours is the scientific standard for such evidence." *Id.* at 59.

In support of this claim, Rain cites generally to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for the standard of admissibility of scientific testimony and asserts that under *Daubert*, "the trial court retains its role as gatekeeper by making a preliminary assessment of whether the reasoning or methodology underlying the proposed expert

testimony is reliable and whether such reasoning or methodology is properly applied to the facts in issue." Rain's Brief at 62. Without any analysis of *Daubert*, Rain baldly concludes that he was prejudiced because trial counsel "allowed scientific norms to be trampled on" and he did not prevent the admission of the GSR evidence in this case. *Id.*

There are a number of problems with this argument. First, *Daubert* applies to the admissibility of novel scientific evidence, not scientific evidence generally, and Rain makes no claim that the evidence presented by the Commonwealth's GSR expert is somehow novel. Second, and significantly, *Daubert* is not the applicable test in Pennsylvania, as our Supreme Court has adopted the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), for the admissibility of novel scientific evidence. *See Grady v. Frito-Lay*, Inc., 839 A.2d 1038, 1043-44 (Pa. 2003). "Under *Frye*, novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Id.* Therefore, Rain's reliance on *Daubert* is misplaced.

Furthermore, Rain's brief cites no authority in support of his assertion that if trial counsel had filed a motion in limine to preclude the testimony of the GSR expert, the trial court likely would have granted it, or that the GSR evidence was otherwise inadmissible because the sample was taken from Rain thirty-six hours after Victim's murder instead of the within six hours. Rain likewise did not present any expert testimony on GSR before the PCRA court.

Instead, Rain asks this Court to presume that trial counsel's decision not to file a motion in limine was prejudicial to Rain. *See Sandusky*, 203 A.3d at 1044. As Rain has failed to demonstrate that trial counsel's decision not to file a motion in limine resulted in any prejudice, his claim relating to the GSR expert does not warrant relief. *See Reid*, 259 A.3d at 405.

## **Ineffective Assistance of Counsel – Cross-Examination**

In issue 5, Rain argues that trial counsel was ineffective in cross-examining Captain Martwinski, Sargeant Detective Ryan Chmura ("Detective Chmura"), West, and Bell. Rain's Brief at 63-70. In support of this claim, Rain relies on *Commonwealth v. Williams*, 141 A.3d 440 (Pa. 2016), for the proposition that the failure to properly cross-examine a witness for the Commonwealth is prejudicial and would necessarily affect the outcome of a trial. *See* Rain's Brief at 70.

At the outset, we recognize that "[t]he Confrontation Clause in the Sixth Amendment to the United States Constitution provides that all criminal defendants enjoy the right to confront and cross-examine adverse witnesses." *Commonwealth v. Rosser*, 135 A.3d 1077, 1087 (Pa. Super. 2016) (quotation marks and citation omitted). The right of cross-examination, however, is not absolute. *Id.* "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* "The scope and vigor of cross-examination is a matter which falls within

the ambit of sound trial strategy to be exercised by trial counsel alone." ***Commonwealth v. Molina***, 516 A.2d 752, 757 (Pa. Super. 1986).

Here, Rain makes no attempt to discuss our Supreme Court's ***Williams*** decision or analyze it in the context of this case. Indeed, ***Williams*** bears no relation to the facts of this case. In ***Williams***, our Supreme Court determined that the appellant's trial counsel was ineffective for failing to ask a single question on cross-examination of the Commonwealth's three expert witnesses or present expert testimony of their own challenging the Commonwealth's experts. ***Williams***, 141 A.3d at 460-67. In this case, there is no dispute that trial counsel cross-examined each of the four witnesses identified by Rain. ***See*** Rain's Brief at 63-70.

Rain further takes issue with the extent to which trial counsel cross-examined these witnesses. ***See id.*** With respect to Bell, Rain asserts that trial counsel should have questioned him regarding the fact that Bell only came forward with information about Victim's homicide while he was imprisoned for a probation violation. Rain's Brief at 64. For West, Rain argues that trial counsel should have challenged her when she testified that she took a gun to her place of employment for personal protection. ***Id.*** at 64-65. Rain claims that West works at a school where guns are prohibited, and this inconsistency in her testimony would have demonstrated that her testimony lacked credibility. ***Id.***

The record reflects that trial counsel conducted significant, in-depth cross-examinations of both Bell and West. *See* N.T., 6/13/2019 (A.M session), at 119-57; N.T., 6/13/2019 (P.M. session), at 28-43. During the cross-examination of both witnesses, trial counsel identified their biases and attacked their credibility, given that they were granted immunity in exchange for their testimony against Rain. *See id.* Indeed, the first question trial counsel asked of Bell pertained to his probation violation. N.T., 6/13/2019 (P.M. session), at 28-29. With respect to West, Rain provides no citation to the record or evidentiary support for his assertion that West works at a school where guns are prohibited. Further, he fails to explain how trial counsel's decision not to cross-examine West as to this singular detail would have changed the outcome of the trial, when the record reveals that trial counsel repeatedly attacked both her and Bell's credibility throughout cross-examination.

As to Detective Chmura, Rain argues that trial counsel was ineffective for failing to question him on his failure to follow Captain Martwinski's directive to follow up on leads regarding Owens as suspect. Rain's Brief at 66-67. He also contends that trial counsel was ineffective for failing to cross-examine Captain Martwinski on his "embellished/exaggerated statements of fact in the initial criminal complaint," and his testimony regarding whether security footage and pictures from TnT Bar showed that Rain was carrying and concealing a firearm. *Id.* at 68.

At the outset, we observe that trial counsel did, in fact, cross-examine Captain Martwinski regarding the criminal complaint. *See* N.T., 6/13/2019 (A.M. session), at 33-38. Second, neither Detective Chmura, Captain Martwinski, nor Owens testified at Rain's PCRA hearing. Thus, there is nothing in the record that indicates what Rain's desired lines of questioning would have revealed or how it may have changed the outcome of trial. *See Pursell*, 724 A.2d at 306. Rain's argument relating to trial counsel's performance during his cross-examination of Detective Chmura and Captain Martwinski amounts to nothing more than vague, speculative, and bald assertions of ineffectiveness. *See Sandusky*, 203 A.3d at 1044. Rain once again asks this Court to presume that trial counsel's cross-examination of Detective Chmura and Captain Martwinski was prejudicial because trial counsel did not ask the questions he believes trial counsel should have asked. However, Rain was not entitled to cross-examination of these, or any other witnesses, in the exact way or to the extent he desired. *See Rosser*, 135 A.3d at 1087. Accordingly, because Rain has not established that he was prejudiced by trial counsel's allegedly deficient cross-examination of Bell, West, Detective Churma, and Captain Martwinski, this claim dose not entitle him to relief. *See Reid*, 259 A.3d at 405.

### Ineffective Assistance of Counsel – Waived Claims

For issues identified as 6 through 10, Rain raises myriad ineffective assistance of counsel claims. *See* Rain's Brief at 70-83. These claims relate

to trial counsel's failure to ensure Rain's presence in the courtroom when, during deliberations, the jury raised a question for the court; trial counsel's decision not to file a petition for habeas corpus or a bill of particulars on Rain's behalf; trial counsel's decision not to file a motion in limine to preclude Wiley from testifying at trial; trial counsel's failure to respond to the Commonwealth's motion in limine and to request a continuance to investigate the shooting of Victim's home that occurred three to four months prior to his murder; and trial counsel's reference to Rain's "code of silence" during closing argument to explain why Rain did not identify anyone else as Victim's killer. *See id.* At no point in his recitation of issues 6 through 10 does Rain cite a single authority in support of his claims. *See id.* Further, the entirety of his claims amount to nothing more than vague and speculative assertions of trial counsel's ineffectiveness, with no explanation or argument, other than conclusory statements claiming that trial counsel's stewardship of the case lacked a reasonable basis or caused prejudice to Rain. *See id.*

"The Rules of Appellate Procedure … state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Commonwealth v. Martz*, 232 A.3d 801, 811 (Pa. Super. 2020) (citation omitted). "This Court will not consider an argument where an appellant fails to cite to any legal authority or otherwise develop the issue." *In re C.R.*, 113 A.3d 328, 336 (Pa. Super. 2015). The failure to include citations to relevant authority constitutes waiver of the issue on

- 24 -

appeal, as it is not the role of this Court to develop an appellant's argument where the brief provides mere cursory legal discussion. ***Commonwealth v. Johnson***, 985 A.2d 915, 924-25 (Pa. 2009).

Rain has failed to properly develop issues 6 through 10 in a manner capable of meaningful appellate review. We therefore find these claims waived.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 5/31/2024